Ernst agt. Hudson River Railroad Company.

# COURT OF APPEALS.

## MARTHA ERNST, executrix, &c. agt. THE HUDSON RIVER RAILROAD COMPANY.

A *defendant* may move for a *non-suit* when the plaintiff rests; or he may give testimony and rest, and then move for a non-suit. The refusal of the judge to grant such motion is equally, in either case, a good ground of *exception.*

After the testimony has been given by the defendant, and both parties have *rested,* and the defendant moves upon the whole evidence for a *non-suit,* it is *the right and duty* of the circuit judge to direct a non-suit at that stage of the cause, if the plaintiff is not entitled to recover, and a verdict in his favor could not be sustained.

Where there is a *disputed question of fact*—as, whether the engine bell of a railroad train was rung at the proper time before crossing a public highway, and evidence upon both sides is given, which is contradictory—it is especially and appropriately a question for the *jury* to determine the means of knowledge and credibility of the several witnesses, and where the weight of evidence rests upon this issue.

In an action for damages for injuries to the person, caused by *negligence,* the plaintiff must present a case of *unmixed* negligence;—a case where the injury is the result *exclusively of the defendant's negligence;*—where no negligence or fault of his own contributed in *any degree* to producing such injury.

In no case is it the duty of the circuit judge to submit a case to the jury, unless the evidence is so doubtful or conflicting that a verdict for the plaintiff or defendant could be sustained, and ought not to be disturbed, upon the principles governing *the review, by the courts, of the verdicts of juries.*

The doctrine that the courts should not *non-suit,* or set aside verdicts, as without or against evidence, in cases of *negligence,* because such verdicts, from the nature of the case, and the character of the facts and circumstances to be investigated, and going to establish negligence, are based so much upon mere opinion, that they cannot possibly be *reviewed,* wholly misconceives the theory upon which justice is administered in this country.

It is not the *jury,* but the *courts* which administer justice. The duty and responsibility of seeing that equal and impartial justice is meted out to all men, devolves, under the constitution, by the common law, upon the *judges of the courts.* Juries are mere *assistants* of the courts, whose province it is to aid them in the decision of disputed questions of fact. If there is no real *dispute* in a case, the court gives judgment.

In the judgment and opinion of a majority of men, *common prudence forbids* the attempt by any person to cross the track of a *railroad* in constant use, without first taking the precaution to *look both ways* upon the track, and see and ascertain that a train is not approaching in either direction; and the omission to do so is, *per se, gross negligence,* in view of the danger to be avoided, and the fatal consequences involved in any accident resulting from such omission.

VOL. XXIV. 7

As upon the whole issue in this case, it was impossible for the jury to find that the
plaintiff had made out a clear, affirmative case of negligence on the part of the
defendants, *unmixed* with any degree of negligence on the part of the deceased,
contributing to the injury sustained, it was not the duty of the circuit judge to
have submitted the case to the jury, and the motion for a *non-suit was pro-
perly granted.* (*Reversing the decision at general term supreme court,* 19
*How. Pr. R.,* 205.)

*September Term,* 1862.

THIS action was brought to recover damages of the de-
fendants, for causing the death of Henry Ernst, deceased.
The cause was tried at the Rensselaer circuit in May, 1859,
before Mr. Justice GOULD and a jury.   The judge declined
to submit any question of fact to the jury, and directed a
non-suit, and ordered the plaintiff's exceptions to be heard
in the first instance at the general term.   The following
are the controlling facts as stated by the general term :

For half a century there has been a public highway lead-
ing from Sandlake to the city of Albany, passing through
the village of Bath and over the Hudson river, by what is
known as the Bath ferry.

The defendants, as is admitted by the pleadings, operate
the Troy & Greenbush railroad, which is located on the
east bank of the Hudson river, and crosses this public high-
way at Bath.   The railroad crosses the highway upon the
same level.

This company have a station-house at Bath, located east
of the railroad track, and just north of the highway leading
to the ferry, and ordinarily have a flagman stationed at the
crossing.

When the accident happened, the deceased resided in
the eastern part of the county of Rensselaer, some fourteen
or fifteen miles from Bath.   His family consisted of a wife
(the plaintiff) and six daughters.

On the 29th day of December, 1855, the deceased, having
a pair of horses attached to a sleigh, was passing upon this
highway, bound for the city of Albany.   On arriving at
Bath, he stopped at a tavern about 158 feet east of the rail-

road track. As the ferry-boat was ready to start, and was only waiting for him, the deceased unhitched his team, seated himself upon the sleigh-bottom, facing the west, and drove at a quick pace directly towards the boat. Just as he approached the railroad crossing, he came in collision with the defendants' train of cars moving south, receiving an injury that caused his death.

The plaintiff's testator was a teamster, and for more than twenty-five years used the road to Albany, crossing at the Bath ferry, and very frequently crossed there. On the morning of the accident, he went to Bath by the Sandlake road, from which the cars were visible, if looked for, as far as the Nail factory, some miles distant, and might be seen nearly all the way from there to Bath crossing. He stopped at Dearstyne's tavern till the ferry-boat was ready to start; he then came out hurriedly, and drove towards the ferry-boat at a rapid rate of speed. He had a two-horse team and an empty sleigh. It was cold weather, and he had a shawl about his face. He had no bells on his horses. In going from the tavern to the boat, the road is nearly level, or a little ascending for 158 feet, when it is crossed by the railroad track. For the whole of this distance, except in passing the station-house, a building twelve or thirteen feet wide, there is no obstacle to seeing a train approaching from the north. The approach of a train can be heard without bell or whistle, from one to two miles. The noise of that train had been heard by one Ostrander, some time before deceased left the tavern. When deceased was at the middle of Mineral street, 125 feet from the track, Ostrander, whom he had nearly run into, heard the noise of the coming cars, looked round, and saw them coming.

The cars were moving at the rate of from thirty to forty miles an hour. Although in a situation to hear, no witness who was examined heard the bell or whistle before the collision. This omission on the part of the engineer in charge

of the train, attracted the attention of the ferryman at the time of the collision.

Miller, the regular flagman, was absent, and no flagman or other person was present to warn travelers of the approach of the train. The flagman is ordinarily there for the purpose of signalizing the train when to stop for passengers.

Shortly before the collision, and as the deceased approached the track, some person on the ferry-boat made signals and motioned for deceased to come on. At the same time there was other hallooing in the street near the crossing. Other motions were made; one man motioned with his hand, waving it towards the east. The bystanders understood the meaning of these signals differently; one thought it meant to keep off; another thought it meant to come on the boat; while others did not understand the meaning at all.

The approach of the train was perceived by several persons near the crossing; some saw it, some heard it. The witnesses did not observe whether the deceased looked up or down the railroad track, as he approached the crossing, and it did not appear that he looked in either direction.

The appointment of the plaintiff as executrix of the last will and testament of her deceased husband, was shown in the case.

JOHN H. REYNOLDS, *for defendants, appellants.*
R. A. PARMENTER, *for plaintiff, respondent.*

By the court, E. DARWIN SMITH, J. The questions involved in this case are of much practical importance.

The case presents a single exception, upon the refusal of the circuit judge to direct a non-suit upon the whole evidence, after testimony had been given by the defendants, and both parties had rested. It was the *right and duty* of the circuit judge to direct a non-suit at that stage of the

cause, if the plaintiff was not entitled to recover, and a verdict in his favor could not have been sustained.

The defendant may move for a non-suit when the plaintiff rests, or he may give testimony and rest, and then move for a non-suit. The refusal of the judge to grant such motion, is equally, in either case, a good ground for an exception.

The negligence imputed to the defendants, and on which the claim to maintain the action is founded, consisted in the omission, by the defendants' engineer, to ring the bell and sound the steam whistle, as required by the statute, for a distance of eighty rods before reaching the crossing. Upon this issue there was much conflicting testimony, and, so far as the proper determination of the action depended upon the single question of the negligence of the defendants' agents in charge of the train at the time of the accident, a verdict in favor of the plaintiff would, perhaps, be warranted by the evidence, or at least could not be disturbed as not founded on sufficient evidence, although the proof was positive from the defendants' agents and others on the train, that the bell was in fact rung and the whistle sounded at and for the requisite distance, yet quite a number of witnesses testified that they did not hear either the bell or whistle ; and it was, therefore, especially and appropriately a question for the jury, to determine the means of knowledge and credibility of the several witnesses, and where the weight of evidence rested upon this issue.

The defence consisted in an attempt to prove that the plaintiff's intestate was also guilty of negligence, and that such negligence occasioned the collision of the train with his team, which caused his death. Upon this issue there is quite an amount of testimony, more or less conclusive, but certainly all tending to establish a case of gross negligence on his part.

He was familiar with the locality ; knew of the existence of the railroad ; that it was in use, and that trains upon it

were constantly passing and re-passing. The train with which he came in collision, was a regular train on its stated and customary time. It was proved that he was a teamster, and had been engaged for about twenty-five years in teaming from Sandlake, where he resided, to Albany, and in going and returning, used to cross the road of the defendants at Bath, where this accident occurred; that he arrived at Bath on the morning of the accident, and stopped at a tavern there, about 150 feet east of the track, about the time the train was due, and after remaining there a few minutes, started for the ferry at a rapid rate of speed; that for most of the way from the tavern to the railroad, the track north of the place of crossing could be seen from the highway. Quite a number of persons at the same place, saw the train coming while he was passing from the tavern to the railroad, and several of them called to him and warned him to stop, and others beckoned to him to do so. These and various other particulars given in evidence, tended to show great carelessness and heedlessness on the part of Ernst, in attempting to cross the railroad at the time and in the manner he did. If the case had been reversed, and the collision between the locomotive and the team of the intestate had thrown the train from the track and killed the engineer, and this action had been brought by his representatives against Ernst, for his negligence in obstructing the train and thus throwing it from the track, and causing the death of such engineer, upon the evidence given on the trial in proof of such negligence, I think no judge would have deemed it proper to non-suit the plaintiff, and the jury would clearly have been warranted in finding a verdict for the plaintiff, which no court, I think, could have held unsustainable upon the evidence, or would have deemed it proper to set aside, independently of the question how far the negligence of such engineer contributed to his death.

And this, I conceive, presents the *true test* for the deci-

Ernst agt. Hudson River Railroad Company.

sion of the motion for a non-suit based upon the conducing and contributing negligence of the plaintiff, in cases of this kind. It was a clear, palpable, *prima facie* case of co-operative negligence. Practically, a duplicate issue arises on the trial in all this class of cases ; and to recover, the plaintiff, it is held, must prevail upon *both* issues. But, in principle, there is but a single issue. The plaintiff must present a case of *unmixed* negligence ;—a case where the injury is the result, *exclusively*, of the defendant's negligence ;—where no negligence or fault of his own contributed in any degree to producing such injury. A party suing for negligence must come into court faultless. He must not present a mere balanced case. The burden of proof is upon him, and he must satisfy the court, by the greater weight of the testimony, that without any carelessness or blame on his part, he has suffered an injury from the wrongful act, default or negligence of the defendant. For such injury, the law gives redress. This is the principle upon which the action for negligence at common law is based.

When the application for a non-suit was made on the trial of this action, did the plaintiff present such a case ? Most clearly, it seems to me, he did not. It was at best, upon the undisputed evidence, a clear case of mixed negligence. It is impossible, I think, to hold or find otherwise upon the whole evidence. A verdict, finding that the death of the plaintiff's intestate was caused by the exclusive negligence of the defendants, and without any want of due care and caution on the part of the deceased, would, I think, be utterly unwarranted by the evidence, and unsustainable, according to the view in respect to the degree of care required of persons attempting to cross a railroad track, hereinafter more fully discussed. In this view, it was the clear duty of the judge to direct a non-suit.

In no case, as I understand the rule, is it the duty of the circuit judge to submit a case to the jury, unless the evi-

dence is so doubtful or conflicting that a verdict for the plaintiff or defendant could be sustained, and ought not to be disturbed, upon the principles governing the review, by the courts, of the verdicts of juries.

But it is claimed quite urgently by counsel, and is assented to by some judges, in substance and effect, that these rules and principles do not apply to actions for *negligence*, and that negligence is purely a question of fact and of opinion, and belongs exclusively to the jury. I agree that negligence is always a *question of fact*. It is always to be inferred from, or imputed upon, *evidence* more or less direct, more or less positive or circumstantial: but I deny that it can be found or imputed without evidence, or that the verdict of a jury finding it will supply the place of evidence, or furnish a substitute for a cause of action. I deny that verdicts finding negligence are not just as much the subjects of review in the courts, as verdicts for any other causes of action. These must be found and predicated upon proper, legitimate and legal evidence, and of this the court must be the exclusive judge.

The argument upon this point, where the divergence of opinion upon these questions really begins, virtually assumes that the courts should not non-suit, or set aside verdicts as without or against evidence, in cases of negligence; that such verdicts, from the nature of the case, and the character of the facts and circumstances to be investigated and going to establish negligence, are based so much upon mere opinion, that they cannot possibly be reviewed. And it is said that the opinion of twelve men in a jury-box should control, (and the decision in such cases is better evidence of the truth,) rather than that of three or four men in bank in the supreme court, or eight judges of this court. This is the effect and substance of the argument constantly addressed to the courts in this class of cases.

This argument wholly misconceives the theory, as it seems to me, upon which justice is administered in this

country.   It is not the *jury*, but the *courts* which admin-
ister justice.   The duty and responsibility of seeing that
equal and impartial justice is meted out to all men, de-
volves, under the constitution, by the common law, upon
the *judges of the courts.*   Juries are mere *assistants* of the
courts, whose province it is to aid them in the decision of
disputed questions of fact.   If there is no real *dispute* in
a case, the court gives judgment.

Jury trial is justly regarded as a most invaluable mode
of deciding disputed issues of fact, where there is contra-
riety and conflict in the evidence.   But its value chiefly
depends upon the fact that the trials are had under the
direction and supervision of educated and experienced
judges, who have devoted a lifetime to the study of the
law and to the practical administration of public justice.
Jurors, on the contrary, are selected from the body of the
people, for a single occasion, and, as a general rule, are
unfamiliar with the rules of evidence, and with the princi-
ples of law, and the processes of legal investigation.   When
the points in dispute are *simple* and *single*, and the facts
are presented and discussed by able counsel, and the issues
involved clearly presented by the presiding judge, the ver-
dicts of juries are generally very satisfactory, and probably
more so than the decisions of the courts on questions of
fact, or any other mode of trial ever practiced among men.

But it is essential to the preservation of this noble insti-
tution, that juries be carefully confined to their legitimate
province, and that the rights and interests of society be
not jeopardized by capricious verdicts, rendered and de-
pending upon uncertain principles.   It is of infinite conse-
quence to the community that the law be kept and pre-
served as certain, clear, known and stable as possible.   This
can only be done by the courts, and this duty is specially
confided to them, and required at their hands by the people.

This necessity makes it the duty of the courts to regu-
late the conduct of juries, to pass upon the evidence sub-

Ernst agt. Hudson River Railroad Company.

mitted to them, and to decide all questions of law arising during the progress of a trial; and to review their verdicts, and to set them aside, if unwarranted by the evidence.

The court is necessarily the ultimate judge in all cases upon the evidence, and must decide whether in conformity with the rules of law it will warrant or sustain a verdict.

The argument that it belongs to the jury to pass conclusively upon the evidence, is fundamentally unsound and untrue, and the argument that the opinion of twelve men in the jury-box is of higher authority upon a question of fact, and better evidence of the truth than the opinion of the judges, is more specious than sound. So far as mere opinion is concerned, the opinion of twelve men of equal intelligence and capability, and means of knowledge and of judgment, is, doubtless, of superior weight to that of four or eight men, a smaller number than twelve. But that consideration does not meet the case.

The decisions of courts and juries stand upon a very different footing.

Aside from the difference in capacity to decide correctly, arising from professional education and practice, and judicial experience, the judges act and decide deliberately, after patient and careful investigation, and give the reasons for their decisions, which are open to the careful scrutiny of the parties, and the vigilant criticism of an educated and enlightened bar, and of the public.

Juries will certainly act and decide more or less hastily, without time, in most instances, for much reflection, and also act and decide in secret; and from this consideration, and their large number, they certainly act under much less personal and individual responsibility than the judges; and besides, common observation and experience show that they are far more liable to be swayed by passion and excitement, and other undue influences. Their verdicts are therefore notoriously many times founded upon mistakes, misconceptions and other errors, which make it indispens-

Ernst agt. Hudson River Railroad Company.

able, to secure to this mode of trial the public confidence, that a power of supervision and review of the verdicts should exist in the courts, and should be exercised with fidelity and firmness.

The *implication* from the argument, that negligence rests in matters of mere *opinion*, and may be imputed upon " *conjecture*" in respect to how men would act generally in given circumstances, is, that verdicts may be rendered by juries finding negligence, upon grounds, principles and conjectures beyond the control of the courts, and outside of the limits within which such verdicts are reviewed by them. Negligence consists in the violation or omission of some duty of positive legal obligation.

So far as the duty is clear and definite upon undisputed facts, it belongs to the courts to declare and apply the law. But when the duty depends upon the exercise or omission of *ordinary care*, or common prudence, the question, I agree, is one of *fact*, and belongs to the jury; but it is to be determined by them upon principles known and recognized by the courts. On an application for a non-suit in such a case, the circuit judge is called upon to apply to the evidence his observation, common sense and common experience, and to determine whether, allowing every legitimate inference which the jury might possibly draw from it, they would be authorized to find a verdict for the plaintiff; and the same rule applies in the review of this verdict, if the case should have been submitted to them and a verdict rendered.

What, in a given case, would be ordinary care, or *common prudence*, would be a question of *judgment*. It would be what, in the case supposed, would be the *conduct of a majority of men in like circumstances*. It would be for the jury to consider and decide this question with reference to the known and recognized interests of human nature, and the ordinary rules and principles of human conduct.

In asserting and obeying the primary instinct of every

human being to preserve and protect life, common sense and the law concur in declaring the rule of common prudence to be *such a degree of care and caution as will be in due proportion to the injury or damage to be avoided.* Persons riding, driving or passing in the crowded streets of a city, or driving horses upon a race course, will ordinarily exercise, and are bound and required to exercise, a much higher degree of care than travelers upon the common highways of the country. So with persons crossing a railroad track, where trains are constantly passing, propelled by the powerful agent of steam. Such collisions almost invariably and inevitably are attended with fatal consequences, and occasion more or less loss of life. Common prudence requires a much higher degree of care and caution.

We come, then, to the question, what is *common prudence,* or what kind or *degree of care* does common prudence enjoin and require in the crossing of a railroad track? This case illustrates the rule, and presents, as I conceive, a complete negative answer to this question. The conduct of Ernst, the intestate, in his attempt to cross the defendants' railroad, at the time of the collision which caused his death, shows most clearly, as I think, what is not *common prudence* in the crossing of a railroad track.

The question is, what would a majority of men of common intelligence, have done under like circumstances? Here was a man of fifty years of age, perfectly familiar with the locality at and about this railroad crossing, living at a distance eastwardly upon the highway intersecting said railroad at that place, which he was continually traveling in his business of teaming to and from Albany, knowing that said railroad was in constant use for the passing of trains propelled by steam, and knowing, also, or bound to know, the stated times for the passage of trains across said highway. With this knowledge, he arrives at the tavern in the village of Bath, distant about 150 feet eastwardly of said railroad, at about the time a train was noto-

riously due upon said railroad, stops a moment at the tavern, and then starts for the ferry across said railroad, at a trot of his horses, neither looking to the right or the left, although a train was then approaching from the north, and might have been seen by him at the distance of 100 rods from the said highway, for nearly the whole distance from said tavern to said railroad, and was in fact seen by quite a number of persons at the same place, and thus driving directly on to the railroad track just as the train reached the crossing, he comes necessarily in collision with the locomotive, and is killed. Was this *common prudence?* Did he exercise *ordinary care? Would a majority of men, with his knowledge, and under like circumstances, have attempted to cross this railroad at the time and in the manner he did?*

These questions, addressed to the eight judges of this court; to the learned judge who tried this cause at the circuit; to the three other judges of the supreme court who affirmed the judgment at general term, out of court, and calling, not for a judicial, but for an individual opinion as to how each of these would act under the same circumstances, and how, in their judgment, a majority of men of common intelligence would act under like circumstances,— would, as I believe, be answered by them, without exception, with an *unqualified negative.* The same questions, put to any one hundred men taken promiscuously from any town or city in the state, I think would be answered in the same way, by as large a majority as nine out of every ten, and the same questions put to the whole voting population of the county of Rensselaer, where the accident occurred, over thirty years of age, I think would be answered in the same way, by as large a proportion; and the jury who tried this cause, if they were men of the intelligence commonly found in the jury-box in this state; and if they were separately asked the same questions, away from the court and the excitement of the trial of such a cause, and the influences which sympathy for the friends of the deceased,

Ernst agt. Hudson River Railroad Company.

and the just prejudices more or less engendered in the popular mind against corporations, by the harsh, heedless and oppressive course with which their corporate powers are many times used and exercised,—or a majority of them would, I believe, answer the questions in the same way.

If this be so, when, superadded to the facts above stated, it also appeared, as it does in the testimony in this case, that Ernst drank intoxicating liquors on his way, that morning, three times—brandy twice, and rum and sugar once; that he drove so carelessly by the way, that he nearly tipped over, and was cautioned at the time by the person riding with him, to drive more carefully; and it also appeared that other persons at the same place heard the train coming at quite a distance, before it reached the crossing; four persons, after he started from the tavern, respectively hallooed to him in a loud voice, *to stop*, several times each, and others beckoned to him to stop, with great earnestness of gesture—all of which was seen and heard by many persons in the vicinity—how much more would such questions be answered in the negative.

These facts also appearing, the whole facts together present a case where, upon the undisputed facts, I think a great majority of men would say that Ernst did not, in attempting to cross the railroad in the manner he did, exercise *common prudence*, and that he was guilty of a neglect of *ordinary care;* such as can only be accounted for, as a general rule, upon the assumption that he was intoxicated, or for some other cause was partially deprived of the use of his ordinary faculties.

Upon this question, therefore, thus illustrated by the facts of this case, I think the conclusion is rational and legitimate, that in the judgment and opinion of a majority of men, *common prudence forbids* the attempt, by any person, to cross the track of a railroad in constant use, without first taking the precaution to *look both ways* upon the track, and see and ascertain that a train is not approaching in

either direction, and that the omission to do so is, *per se,* *gross negligence,* in view of the danger to be avoided, and the fatal consequences involved in any accident resulting from such omission.

As, therefore, upon the whole issue, it was impossible for the jury to find that the plaintiff had made out a clear, affirmative case of negligence on the part of the defendants, unmixed with any degree of negligence on the part of the deceased, contributing to the injury sustained, it was not the duty of the circuit judge to have submitted the case to the jury, and the motion for a non-suit should have been granted.

The judgment, therefore, should be reversed, and a new trial granted, with costs to abide the event.