MARTHA ERNST, Executrix of Henry Ernst, Appellant, *v.* THE HUDSON RIVER RAILROAD Co., Respondent.

The omission by a railroad company to give the signals required by the statute, on the approach of a locomotive within eighty rods of a highway crossing, is a breach of duty to the passengers, whose safety it imperils, and to the wayfarer, whom it exposes to mutilation and death.

Such a crossing is dangerous, only when the company makes it so by propelling its engines across it; and the statute, therefore, for the protection of human life, exacts public warning of the approach of such danger. The injunction is plain and absolute, and the company which violates it does so at its peril.

The omission of the customary signals is an assurance by the company to the traveler, that no engine is approaching from either side within eighty rods of the crossing; and he may rely on such assurance, without incurring the imputation of breach of duty to a wrong-doer.

When the passer-by knows of the immediate proximity of an advancing train, whether the warning be by signals or otherwise, and, having a safe and seasonable opportunity to stop, he voluntarily takes the risk of crossing in front of it, he is guilty of culpable negligence and forfeits all claim to redress.

But when the usual warning is withheld, the wayfarer has a right to assume that the crossing is safe, and that the company is not violating the law, and endangering human life, by running an engine without signals.

The citizen, on the public highway, is bound only to the exercise of ordinary care; and when he is injured by the negligence of a railroad company, it is no answer to his claim for redress, that, notwithstanding the omission of the signals, he might, by greater vigilance, have discovered the approach of the train, if he had foreseen a violation of the statute, instead of relying upon its observance.

TIFFANY — VOL. VIII.    2

The traveler is not bound to stop on the highway, or to look up and down an intersecting railway track before crossing, when there are no signals of an approaching engine.

Ordinarily, in cases of this description, the question whether the party injured was free from culpable negligence, is one of fact to be determined by the jury, under appropriate instructions, and subject to the revisory power of the courts.

Where the proof is undisputed and decisive, that the plaintiff was guilty of misconduct, and that this contributed to the injury, a nonsuit is matter of right; but it is equally matter of right to have the issue of negligence submitted to the jury, when it depends on conflicting evidence, or on inferences to be deduced from a variety of circumstances, in regard to which there is room for fair difference of opinion between intelligent and upright men.

The decision in this case, on a former occasion, is reported erroneously in 24 How. Pr. R., 97.

APPEAL from judgment of the Supreme Court in the third judicial district, sustaining a nonsuit on the trial at the Rensselaer Circuit.

The action was brought by the plaintiff, as the widow and executrix of the testator, for damages sustained by the act of the defendant, in negligently and unlawfully killing her husband, at the village of Bath, on the 29th day of December, 1855.

The suit was commenced in 1856. The first trial was before Mr. Justice GOULD, who nonsuited the plaintiff. The case was heard at General Term, before Judges HOGE-BOOM, PECKHAM and GOULD. The nonsuit was set aside and a new trial was granted; the opinion of the court being delivered by Judge HOGEBOOM, and GOULD, J., dissenting. (32 Barb., 159.)

The second trial, before Judge HOGEBOOM, in February, 1861, resulted in a verdict for the plaintiff. A motion for a new trial, on the ground that the verdict was against evidence, was made and denied at the Special Term. An appeal was taken from the judgment, as well as the order, and heard on a case and exceptions before Judges WRIGHT, HOGEBOOM and GOULD. Both were affirmed at General Term, the opinion of the court being delivered by Judge WRIGHT, and GOULD, J., dissenting.

The defendant appealed, and a new trial was granted

here by a divided court. An imperfect and erroneous report of the case will be found in 24 How. Pr. R., 97.

On the last trial, in Nov., 1865, the plaintiff was nonsuited, and the judgment was affirmed *pro forma* in the court below.

The facts were much more fully developed than on the previous trial, and material additional evidence was given, to repel the proof relied on by the defendant to impute negligence to the plaintiff. At the close of the evidence, a motion was made for a nonsuit, which was granted, in deference to views supposed, from the head-notes of the case as reported in 24 How., to have received the sanction of this court.

The plaintiff having been nonsuited, the truth of such facts as he proved by disinterested and credible witnesses is to be assumed, without reference to contradictory evidence by the defendant. The material facts thus established are as follows :

The testator resided in the county of Rensselaer, about fifteen miles from the city of Albany, which was his market town. His family consisted of his wife and six daughters. He was about 45 years of age. He was an active and industrious man. His health was good; his habits were regular, and his vision clear. He was accustomed to the use of horses, and had been a teamster on the road from Sandlake to Albany for twenty-five years. He was familiar with the ferry, the railroad, the signals, the station and the localities.

The crossing at which he was killed is in the village of Bath, near the river side. He was driving down Rensselaer street to the ferry landing at its foot, for the purpose of crossing to Albany. The railroad intersects that street at right angles. The highway he was traveling, and the ferry to which he was bound, had been used as such for more than half a century; and this was the point of convergence of the principal thoroughfares of Rensselaer, and the usual route of travel to Albany by the ferry connecting the city with the village of Bath. Next east of the railway track is

Broadway, a street sixty feet wide, which crosses Rensselaer
street at right angles, being parallel with the river. On the
southeast corner of these two streets is Dearstyne's hotel, at
which the testator, having rode some fifteen miles, stopped
to warm before crossing the ferry, the morning being very
cold. Van Denburgh, whose team was in front of his,
stopped at the store, and on coming out drove down to the
ferry-boat. On looking back, he saw Ernst get into his
sleigh, turn his team and drive down toward the boat.
This was a little before ten o'clock in the morning.

The distance from Dearstyne's hotel to the railroad track
was 112½ feet, and about 100 feet from there to the ferry
landing. The descent from the hotel to the track was
moderate, but from there to the ferry it was steep. Rens-
selaer street, like Broadway, was sixty feet wide. The
station-house was on the north side of Broadway, where it
obstructed the view of the traveler as he approached near
the track. After Ernst was killed, it was removed to the
appropriate place on the opposite side, where it does not
hide the approach of an engine. The railroad track
approaches the crossing from the north on a curved line,
running on a level below the upland and near the river side.
There is an ice-house on the river side of the track, which is
36 rods or 594 feet north of the crossing; from that point
there is a sharp curve in the road to the northeast. There
is no point in Rensselaer street, from Dearstyne's down to
the station-house, where a man, standing erect and looking
directly north, could see an approaching train before it
reached the ice-house. The only point, at which it is possi-
ble to see this distance, is just before reaching the station.
The elevated land between Rensselaer street and the ice-
house, and an intermediate park of trees, intercept the sound
of an approaching train and limit the range of vision. The
ground, within a hundred and fifty feet north of Rensselaer
street, is twelve feet higher than the level of the streets
and railroad, and there the park commences, still further
obstructing the northern view.

Ernst, when he stopped, had driven his horses round to the

front of Dearstyne's hotel in Broadway; and in turning them round, to resume his way in Rensselaer street, he necessarily faced to the north, and had a full and open view of the track for twenty rods north of the crossing, which was the limit of the range of vision, not only at the intersection of Rensselaer street and Broadway, but also for a considerable distance westward toward the crossing.

As he looked north, at this, the natural point of observation, there was no train in view, and as he looked west, he saw that there was no flagman. Starting at first on a walk, his horses then took a slow trot, which they kept until they were near the station-house. The ferry-boat was about starting, when Simmons, who was standing near the crossing, seeing Ernst driving down, hailed to the ferryman to wait for him. Simmons then beckoned to Ernst to hurry on, as the boat was waiting for him. Signals were also made to him from the boat to come on. He started up his horses to a brisk trot, and just as they were within two or three rods of the track, in full motion, the engine emerged from behind the station-house; and simultaneously with the rush of the advancing train, Rouse, an old man who happened to be standing on the station platform, and Hunter, who stood on the stoop of the store on the south side of the street, hallooed to him from opposite directions; and the frightened horses plunged southward on the track, where the team was knocked down by the engine, and Ernst received the blow of which he died. The defendant's fireman admits that he saw the testator attempting ineffectually to keep back his horses.

It was proved that this was a station for a flagman, and that it was, and long had been, the uniform practice of the company, known to and relied on by those who traveled the road, to give warning when a train was sufficiently near to make the crossing dangerous, by having a flagman on the middle of the track, holding up a white flag if the train was to stop, and a reg flag if it was to pass without stopping.

Four witnesses for the plaintiff, who saw the whole transaction, and who knew Miller, the flagman, swore that he

was not there, and that no flag was there.   Of the defend-
ant's witnesses, Hunter and the engineer both swore that
there was no flagman.   The fireman testified that there
was one, and that he saw him waving his flag; but he
was impeached by his own oath before the coroner's jury,
where he swore positively that he saw no flag.

The bell was not rung nor the whistle sounded, as
the train approached the crossing.   It is true that the
engineer and fireman, who were the immediate actors in
causing the death of Ernst, claimed that they gave the
signals, but the trackman did not confirm their state-
ment; and the conductor frankly admitted that he was in
the baggage-car, where he could have heard the bell if it
had been rung; that he was in the habit of noticing signals;
that he could not say the bell was rung; and that the first
he heard of the whistle was when it was blown to apply
the brakes at the point of collision.   The defendant's wit-
ness Hunter, who was standing within thirty-five feet of the
crossing, unoccupied and looking up the track, admits that
he discovered the approach of the engine when it was within
about a hundred and sixty feet of the crossing, and that he
heard no signal either by bell or whistle.   The engineer
himself admitted, when sworn at the inquest over the body
of Ernst, that the bell might not have been ringing when
they came to the crossing.   Dearstyne, the ferryman, stand-
ing on the boat at the landing, on the look-out for signals,
swears that they neither rung the bell nor sounded the
whistle until after the collision, when they began to do
both immediately; that he had observed the omission in
some previous instances, being on the look-out for passen-
gers by stopping trains; that he heard their approach when
they got within three hundred feet of the crossing, when he
could not see them, by reason of intervening buildings;
that his attention was drawn to it at the time, by hearing
the cars before he saw them, and that the bell was not
ringing when the train came in sight.

Brown, who was drawing gravel at the ice-house, thirty-
six rods above the crossing, testifies that they neither blew

the whistle nor rung the bell as they approached the cross-
ing; that his attention was drawn to the fact particularly at
the time; that he had occasion to drive across the track just
at the corner of the ice-house, another gravel team having
crossed the track just before him; that just as his horses
were across the track and his wagon on it, this train
suddenly appeared, within less than a hundred feet of
him; that until then he neither saw it nor heard its
approach; that the train passed on while he and the other
teamster were speaking of the omission of the signal;
and that within half an hour after he went to the crossing
to water his horses, and then he heard of the collision by
which Ernst was killed.

Ten Eyck, who was at the store and within some thirty
or forty feet of the crossing, unoccupied and looking up
the track, testifies that the bell was not rung nor the whis-
tle sounded until after the collision, and that they then
began to do both; that he noticed the fact at the time, and
that when he discovered the cars, they were within about
ninety feet of the crossing, and he saw Ernst driving up to
the track and Hunter making motions to him immediately
before the collision.

. Taylor and Traver both testify that they heard no signal
until after the collision, and that immediately after it the
whistle was sounded and the bell was rung.

It was a very light train, only two cars being attached to
the locomotive; one a baggage and the other a passenger
car.   Two witnesses gave estimates, widely different from
each other, as to the distance a train might be heard by one
listening for the sound.   One thought it might be heard
one or two miles, and the other that it would not be audible,
when the whistle would be, at a distance of seven or eight
rods.

The fact is undisputed, that the approach of this partic-
ular train was so noiseless, from the rapidity of its motion
against the wind, the elevation of the intervening upland,
the obstruction of trees and buildings, or the prevalence of
other sounds in a busy and populous neighborhood, that

even the ferryman, who was upon the look-out, did not detect it until it was within three hundred feet of the crossing; and Taylor, Traver, Ten Eyck and Van Denburgh, all in the immediate vicinity, could not and did not hear it at all, until they saw it rushing out from behind the station-house, immediately before the collision. Brown testifies that its approach was so imperceptible that it was not noticed by him or his horses, when he drove them across the track, though it was then within less than a hundred feet of him. It was also proved that there were four railroads in the immediate vicinity, so that the noise of cars, in the absence of signals, did not indicate their presence on that road.

The cars were moving with great velocity; and Dearstyne, the ferryman, who waited for the trains, and knew the times at which they were due, observed at the time that they were not passing at the regular hour. The proof was decisive that the speed of the cars at the crossing was greater than usual, and that they were going from thirty-five to forty miles an hour. Of the inculpated employés of the defendant, the engineer claimed that they had been going only at the rate of about twenty-five miles an hour, and the fireman that they were going only at the rate of ten or fifteen miles an hour; but both admitted that on reversing the engine and applying the brakes, they were unable to stop the engine until they reached the cattle-guard, which was proved to be some nine hundred feet below the crossing, though they represented it as less than half that distance. It was proved by Mr. Squires, an experienced railroad conductor, and the fact was undisputed, that if they had been going only at that rate, with the light train they had, the reversing of the engines and application of the brakes would have stopped the cars in fifty feet, being one-eighteenth part of the distance they run after the collision.

The fact that Ernst, when he turned his horses round from Broadway into Rensselaer, faced and looked north in the direction of the track, as far as it was within the range of vision, was proved and undisputed. The range at that

point was some twenty rods north of the crossing. He was some 112½ feet from the crossing when he started, and assuming the testimony of the plaintiff's witnesses to be true, he was advancing at the rate of about six feet per second, and nineteen seconds would bring him to the crossing. If the speed of the engine was thirty-five miles an hour, it was advancing at the rate of about three rods a second, or three rods and a half a second if its speed was forty miles an hour. Assuming that it was coming only at the rate of thirty-five miles an hour, the engine, when he started, nineteen seconds before the collision, was fifty-seven rods north of the crossing, and twenty-one rods north of the ice house, on the sharp curve beyond the uplands, and far beyond the range of vision.

The witnesses could not testify whether he did or did not afterward turn his head again to the north in the few seconds that intervened. There was no point where, even if he had been standing erect, he could have seen the track beyond the ice-house, which was within 594 feet of the crossing. But he was on a lumber sleigh without a box, and, as usual in such cases, he was sitting on the bottom of the sleigh. No proof was given as to the extent to which this reduced the range of vision. It was proved that in riding west it was not necessary to turn the head, to see the track above the crossing, within the probable limits of his view in that position. There was no evidence that he did not look to the north repeatedly on the way down, unless it be inferable from the fact that there was no sound or signal to call for a repetition of the precaution, and the further fact that they were beckoning to him in front to come on to the boat, and that he was approaching a steep descent which required his attention to his horses. Whether he looked north again or not, the evidence clearly shows that he could not have seen the engine in time to avoid the collision; for it is proved by the defendant's witnesses that neither of the three men at the look-out in front of the engine saw either him or his team, until the very instant before the collision.

TIFFANY — VOL. VIII.    3

He had a handkerchief tied round his neck, as usual in very cold weather.

Hunter was called by the defendant to prove that as he was standing some thirty-five feet from the crossing, and Ernst was passing him on a brisk trot, he called to him to hold on. Hunter admits that he was himself excited and frightened, the cars being then close to the crossing, and that Ernst did not appear to hear him.

This evidence was met by proof that Taylor and Dearstyne, who were facing Hunter, which Ernst was not, did not hear him; that Ten Eyck, who was in front of the same store and within a few feet of Hunter, did not hear him, though he saw him motioning with his hand; and that at the moment of Hunter's warning, Ernst was just driving on the track, and the engine rushing within sixty feet of him.

Tator, a trackman of the defendant, who claimed to have been lounging at ten o'clock in the morning in the passenger room, was also called to prove that while Hunter was endeavoring to attract Ernst's attention on one side, he was hallooing from the other, and the flagman warning him back from the crossing. He admits that Ernst was then within fifteen feet of the track; but it was proved by the witnesses that his statement as to the main fact was utterly untrue.

The proof was clear that motions were made by Simmons, Hunter and Rouse; that those who saw the motions of Simmons, who alone was in front of Ernst, understood them as beckoning him on to the ferry-boat, which was waiting; that those who heard the halloo of Hunter, and saw his motions and those of Rouse, which Ernst probably did not, were in doubt, until the engine appeared, whether they were beckoning him to go forward or to go back.

The proof was equally clear, that the warnings, if heard and seen by Ernst, were too late; that the horses were in full motion and within fifteen feet of the track; that they were frightened and plunged southward on the ties, and that Ernst ineffectually tried to pull them back.

It was proved that Gregory, who acted as engineer, was a boy, who described himself as some eighteen years of age when he ran over Ernst, and who had shortly before been taken from work in a machine shop to act as engineer on the defendant's road. It appeared that he and Porter, the fireman, were the same employés who had run over and killed another traveler some two months before in the city of Troy.

Their testimony and that of the trackman was discredited by the other evidence in the case, given by disinterested witnesses.

The trackman, among other things, swore that the flagman was at the crossing, a fact that is disproved on all hands; that Ernst was within thirty feet of the track and driving ten miles an hour, when the train was at the icehouse 594 feet above; that driving at that rate, he stopped them directly on the track, and they remained there, standing still on the track for a minute, waiting until the engine came down and struck them.

The engineer swore that it was a local train at the usual time, a fact as to which he was flatly contradicted; that he blew the whistle eighty rods from the crossing; and that the bell was rung continually from that point down to Rensselaer street; a fact on which he is confirmed neither by the conductor nor the trackman, and on which he is contradicted by Hunter and Van Denburgh, two of the witnesses for the defendant, as well as by Taylor, Traver, Dearstyne and Brown. He swore before the coroner's jury that he saw the flagman motion to Ernst to stop, and on the last trial he admitted that the statement was false. He swore on the inquest, that after the warning by the flagman, Ernst urged his horses faster with reins or whip; and on the last trial he admitted the fact to be untrue, and swore that he did not see the team of Ernst at all until after the collision.

The fireman testified, among other things, that the whistle was blown more than eighty rods above the crossing; that the bell was ringing all the way down; and that, when the

engine was at the ice-house, he saw Rouse motioning with a flag. He was contradicted by his own oath before the coroner's jury, where he swore that he saw no flag. He admitted, on the last trial, that he did not see the testator's team until after the collision, though he swore on the inquest that he did.

Seven witnesses were sworn in behalf of the plaintiff on the last trial, who were not in attendance on the previous trial, and they testified to material facts tending to discredit and rebut the facts before proved by the defendant, and relied on to inculpate the testator as guilty of negligence.

The defendant neither produced, nor gave any excuse for the non-production of Simmons, Butler and Waltemyre, their three principal witnesses on the former trial, and on whose testimony, mainly, as appears clearly from the prevailing opinion, the new trial was ordered when the cause was before this court on a former occasion. Ostrander, who is erroneously represented in the report of the case in 24 Howard, 99, as swearing on the trial then under review in this court, to material facts inculpating the deceased, was not sworn at all, either on that or on the last trial. The entire statement, there prefixed to the opinion, was evidently made substantially from the report of the review in the Supreme Court of a previous trial, in which the plaintiff was nonsuited. (32 Barb., 159; 19 How., 205.) The review in this court was of the second trial, in which the plaintiff recovered.

Proof was offered, in behalf of the plaintiff, of the dying declaration of the testator, that he had no warning of the approach of the train, but on the objection of the defendant it was rejected.

*R. A. Parmenter*, for the appellant.

*J. H. Reynolds*, for the respondent.

PORTER, J. When this case was here on a former occasion, a new trial was granted on the ground that a nonsuit had been refused, upon a state of facts, of the truth of which

there is now no pretense. That decision is unreported in the regular series; but one of the opinions delivered in this court is contained in another law publication. (24 How. Pr., 97.) In that report, through some misapprehension or oversight, the head-notes, as well as the preliminary statement of facts, are essentially erroneous. The body of the opinion, however, discloses a very striking difference in the evidence, as then and as now presented, on the vital question, whether the husband of the plaintiff was a negligent and guilty participant with the defendant in the wrong which resulted in his death. We find the difference still more marked on examining the printed cases, upon which the decision of this court was founded.

It seems that the plaintiff was surprised on that trial by proof, which she probably had no reason to expect, but which was not repeated on the last trial, when she was prepared with evidence to meet it. The prevailing opinion assumes — and we are at liberty, and perhaps bound, to suppose that the testimony of Simmons, Butler and Waltemyre, whom the defendant did not call on the last trial, justified the assumption — that Ernst was intoxicated on the occasion of the collision; that he drove so carelessly by the way that he nearly tipped over; that he was cautioned at the time by the person riding with him to drive more carefully; that he was partially deprived of the use of his ordinary faculties; that he knew the stated times for the passage of the trains; that this was, in fact, a regular train, on its stated and customary time; that it was notoriously due at that hour; that Dearstyne's hotel, at which Ernst stopped, was 150 feet east of the track; that he started from there at a rapid rate of speed; that other persons heard the train coming at quite a distance; that *four* of them, after he started from the tavern, respectively called to him in a loud voice *to stop*, several times each; that quite a number of persons saw the approach of the train; and that he had an open view of it, nearly all the way from the hotel to the crossing, for a distance of a hundred rods from the highway on which he was riding. (24 How., 102, 108, 110.)

In the light of the evidence given on the last trial, it is not difficult to infer why testimony like this was not reproduced, when the plaintiff was prepared to meet it. Simmons, one of those witnesses, swore there was a box on the testator's sleigh, and a seat on the box; represented, in substance, that this intoxicated man, who had been running his horses and drinking at every tavern, had his head, as well as his face, bundled up in a big shawl; that he, himself, heard the cars coming, and standing near the track, face to face with Ernst, when the latter was half way down from the tavern, told him to stop for God's sake or he would be killed. It appears that Butler, on that occasion, swore with equal zeal. His version of the matter in substance was, that he stood at the northwest corner of Broadway and Rensselaer streets; that he hallooed from there to Ernst as he was passing, to hold on; that the testator appeared to hear him, but turned his head away, and, in defiance of the warning, drove on to the crossing. Waltemyre, on that trial, went further still, and, in effect, represented Ernst as driving his horses on the track directly in front of the engine, though warned of its approach by the whistle, the bell and the flagman.

The testimony of these three men, then given and now withheld, explains the former decision that, upon such a state of facts, the plaintiff should have been nonsuited. It also explains why that decision was by a divided court. Such testimony, though not met by a point-blank contradiction, was too improbable in its nature, and too inconsistent with the other facts proved, either to obtain credence with the jury, or to commend itself to the full confidence of practiced jurists. It happened that the case, upon the testimony as then given, was heard in this court and the court below, by ten of the judges, only five of whom differed in their conclusions on the question of fact from the jury. It is scarcely to be supposed that they would have hesitated to approve the verdict, if it had been rendered upon the proof presented by the respective parties on the subsequent trial.

It now appears that the prominent facts then relied on to

inculpate the testator were fictitious. Instead of being a drunkard, stupefied or crazed with liquor, he is proved to have been an orderly, sober and respectable citizen. The pretense that he drank anywhere that morning is abandoned, and his family physician testifies that he never knew him to be intoxicated. Instead of being deprived of the use of his faculties, he is shown to have been a · man in the prime of life, of regular habits, with clear vision, and in perfect health. Instead of running his horses by the way, and starting from the tavern with reckless speed, he is shown to have been an experienced and practiced driver; and it is proved that, on this occasion, he started from the hotel on a walk, and continued to drive with moderation, prudence and judgment. The claim that he knew the stated times of the trains is also abandoned. The fact that this was a regular train, on its customary time, is alleged by none, even of the defendant's witnesses, except Gregory the engineer; and he is contradicted by Dearstyne, an intelligent and disinterested witness, who knew the time of the trains, waited for them with his ferry-boat, and observed the fact, at the time, that this was a train not then due. The defendant, knowing the fact to be in issue, neither produced its time-tables, nor confirmed Gregory's statement by the testimony of any of its other employés. The absence of the flagman from his post is strong presumptive evidence that no train was due at that hour. Under such circumstances, no court has a right to assume, as matter of law, that the statement of the inculpated and impeached engineer is true, and that the contradictory testimony of a reliable and disinterested witness is false.

It now appears that, instead of the testator's riding a hundred and fifty feet in full view of the engine, the whole distance from the hotel to the track is less than a hundred and thirteen feet, and that he did not see the engine at all, until it emerged from behind the station-house, when the horses were in the very act of going upon the crossing. It also appears that, instead of his having, from the hotel down, except opposite the station-house. an open view of the

northern track for a hundred rods, there was but one place in the whole distance where, even if he had been standing up and expecting a train, he could have seen it as far north as the ice-house, which was within five hundred and ninety-four feet of the crossing. The track, instead of being straight, was sharply curved. The view, instead of being open, was obstructed by intervening woods and upland. The natural point of observation, when there was no signal of an approaching train, would be at the corner of Rensselaer street, as he turned his horses round to the north and drove into it from Broadway. The proof is explicit, that from that point the range of vision is but about twenty rods, and it is equally decisive that, when he was at that point, the engine was behind the hill and woodland, at least fifty-seven rods above the crossing. Ernst, as he drove down, was sitting on the bottom of his sleigh, which had no box. This, of course, materially narrowed his range of vision, and made every intermediate fence an additional obstruction to the view.

There is no pretense now that any one east of the store which adjoins the track either saw or heard the train at all, until it reached the crossing. Ten Eyck and Hunter were at the store, within two or three rods of the rails. Both of them were looking north, and both unoccupied; yet neither of them saw or heard the engine until it was within less than two hundred feet of them, the horses of Ernst being then close to the track and in full motion. It was not seen at all by the witnesses Taylor, Traver, Dearstyne and Van Denburgh until just before it reached the crossing; and none of them heard it until then, except the ferryman, who was more familiar with the sound, and who detected it first, while looking in that direction from below on the river side, when the cars were within three hundred feet.

The claim that four men were hallooing to Ernst to stop, when he was not yet half way down, is also now abandoned. But two men halated at all, one from the store and one from the station-house, while the team was passing between

them. If Ernst heard what either of them said, the fact is undisputed that no one else did. The warning was well meant, but it came too late. It was simultaneous with the *res gestæ;* with the rush of the engine, the plunge of the horses, and the ineffectual struggle of the testator to rein them back.

The proof is clear and decisive, that the bell was not rung nor the whistle blown until after the collision. Only two of the defendant's witnesses claimed that they were; and they were the two employés whose neglect of that duty cost Ernst his life. One of them was a mere boy. Both were impeached on material points, by their own oaths before the coroner's jury. They had officiated some two months before as engineer and firemen, when Wilds was killed. They were specifically contradicted as to the whistle and the bell, by two of the defendant's and five of the plaintiff's witnesses, and they were confirmed by nobody.

On the last trial it also appeared that this was a flag station; that it was the known and uniform practice of the company, whenever there was a train advancing within eighty rods of the crossing on either side, to give notice to the public of its approach by exhibiting, at that point, a white flag if the engine was to stop, and a red flag if it was to pass without stopping. There was neither flag nor flagman at the crossing; and thus the practice, which was adopted for the security of the traveler, was converted on this occasion into a snare for his destruction.

On this state of facts, there was nothing to justify the imputation of culpable negligence to the testator; and, most manifestly, there was nothing to warrant a court in adjudging his guilt as matter of law, without the intervention of a jury.

In determining the propriety of a nonsuit, we are legally bound to assume the truth of the facts which the testimony of the plaintiff legitimately conduced to prove, though their correctness be controverted by the defendant's witnesses. (*Colegrove* v. *The New Haven and Harlem Railroad Companies,* 20 N. Y., 492; *Merritt* v. *Lyon,* 3 Barb., 110.) It is

the appropriate province of the jury to deduce inferences of fact, and to weigh doubtful or conflicting evidence.

The testator was lawfully upon the public highway. The right he had to use it was as perfect as that of the defendant to cross it. In the exercise of his legal privilege he did not expose others to injury, and was charged with no duty of extraordinary vigilance. The defendants exercised theirs, with agencies imminently perilous to human life, and they were under a correlative obligation to use them with the highest degree of care. As the highway was never dangerous, except when they made it so by driving their engines across it, and as they never crossed it without some degree of jeopardy to the wayfarer, the law provided for the security and protection of the citizen, by requiring the defendants to give special and public warning, whenever their engines approached the crossing.

The rights of the people of Rensselaer in their own highways are not subordinate to those of the railroad company. If the traveler is warned of the approach of an engine by the customary signals, or if by other means he is made aware of its proximity, it is his duty to avoid exposing himself to injury. If he advances on the open highway, with no cars in view, and no indications of their approach, either by signal or otherwise, he is at liberty to pursue his way, without incurring the imputation of breach of duty to a wrong-doer.

The only condition of the right to redress for a wrong of this description is, that the party aggrieved be free from culpable negligence; and he is not chargeable with such negligence, unless he fail to exercise ordinary care and vigilance to avoid the injury of which he complains. There has been some diversity of judicial opinion as to what ordinary care and vigilance demand of a party, upon a given state of facts; but, that this is the uniform standard, by which to test the right of the plaintiff, has been too often adjudged to be open to further discussion.

The rule is simple, practical, and easy of application. "The question is," as this court said, when the case was before it on a former occasion, "what would a majority of

men of common intelligence have done under like circumstances?" (24 Howard, 108.) "Ordinary care, skill and diligence, is such a degree of care, skill and diligence, as men of ordinary prudence, under similar circumstances, usually employ." (*Brown* v. *Lynn*, 31 Penn., 512.)

The degree of care which men of common prudence would be likely to observe in a given case must be determined with reference to all the attendant circumstances. An injury by an engine *in motion* would necessarily be of a grave and serious character; but at a distance of eighty rods from the crossing, it would be as harmless to the wayfarer as the rail over which he drives. It is not unusual in argument to confound the seriousness of such an injury, when it occurs, with the probability of its occurrence, and to assume that the same degree of vigilance is demanded when the engine is not within the range of sound or vision, as when it is seen in close proximity, or public warning is given of its approach.

The measure of precaution which ordinary prudence suggests is in due proportion to the probability of danger. When a train is seen or known to be close at hand, a discreet man would stop until the danger is past; but to stand waiting in front of a public crossing, with no reason to believe that there is an engine within a quarter of a mile, would indicate overcautious timidity, and would seem to most men puerile. On such subjects, as on all others, men exercise their reason, and do not yield to childish apprehensions of distant engines or unloaded guns. When they draw near a railway crossing, and the flagman gives no warning, when no sign or sound indicates the presence or approach of a train, they assume that they may safely cross, and proceed quietly on their way. If, in such a case, an engine, with muffled bell, rushes upon them too suddenly for escape, the wrong is due to those who falsely assured their safety by withholding the usual warning.

The citizen who, on a public highway, approaches a railway track, and can neither see nor hear any indication of a moving train, is not chargeable in law with negligence, for assuming that there is no car sufficiently near to make the

crossing dangerous. (*Newson* v. *New York Central R. R. Co.*, 29 N. Y., 390; *Johnson* v. *Hudson River R. R. Co.*, 20 id., 74; *Hegan* v. *Eighth Avenue R. R. Co.*, 15 id., 383; *Harper* v. *Curtis*, 1 E. D. Smith, 78; *Gordon* v. *Grand St. R. R. Co.*, 40 Barb., 550; *Pennsylvania R. R. Co.* v. *Ogier*, 35 Penn., 60, 72.) In the case first cited, Judge JOHNSON, who delivered the opinion of the court, stated the rule thus: "The law will never hold it imprudent in any one to act upon the presumption that another in his conduct will act in accordance with the rights and duties of both." In the case of *Gordon* v. *The Grand St. R. R. Co.*, Judge BROWN traced the rule to the reason on which it was founded. "Negligence," he says, "cannot be predicated of such an act. Care in avoiding danger implies that there is, or would be with all prudent persons, something to create a sense of danger; for, if the circumstances are not such as would put a prudent and cautious person upon his guard, the omission to exercise more than ordinary attention is not the negligence which contributes to an accident." In the case last cited, the court, in considering the effect of the omission to give the customary signals, on the question of due care by the plaintiff, used language equally explicit. "A defendant cannot impute a want of vigilance to one injured by his act, as negligence, if that very want of vigilance were the consequence of an omission of duty on the part of the defendant."

In the present case, the defendants not only misled the testator by not exhibiting the flag at the crossing, in accordance with the uniform custom when an engine was near, but also by approaching the highway illegally, neither sounding the whistle nor ringing the bell as they advanced. This was an act in open defiance of a public statute, enacted for the protection of the traveler. It was a flagrant breach of duty to the passengers, whose safety it jeopardized, to the stockholders, whose property it imperiled, and to the testator, whose life it exposed. Its direct tendency was to put him off his guard, to disarm his vigilance, and to produce a false sense of security. To transfer the blame to him, would be to screen the wrong-doer at the expense of the victim. It is

not the policy of the law to favor those who deliberately violate its mandates, nor is it the duty of the courts to invent excuses for wrong-doers, or to palliate the guilt of reckless homicide. Our statutes for the protection of life are to be obeyed; and when they are broken and defied, responsibility is not to be invaded by imputing blame, without proof, to him who suffers death, for the sake of shielding those who inflict it.

In this case, the parties inculpated have been sworn. Ernst, of course, could not confront them; but we are to judge him in the light of the evidence, by the ordinary rules which govern human action. He was a man of business, in the vigor of middle life, and in the full possession of his faculties. He was a man of family and of character, of experience and of judgment. He had no apparent motive or inducement to make a wanton sacrifice of his life. He had the ordinary instincts of humanity. If, on this occasion, he did anything which he ought not to have done, or left undone anything which he ought to have done, it was in the brief interval of nineteen seconds.

It is said he should have looked north before he drove down the street, which the defendant, by violating the statute, could convert into a *cul-de-sac* to the traveler. That was precisely what he did. In turning his horses around to drive from Broadway into Rensselaer street, he necessarily faced to the north and west, thus commanding a view of the track directly in front for a distance of some twenty rods. He did not see the cars, for the simple reason that they were not there. They were still behind the hill, and nearly sixty rods northeast of the crossing.

It is claimed that he started at a high rate of speed; but the proof is, that he started on a walk; that he went down Rensselaer street on a slow trot, and that he did not quicken his gait until, as he approached the track, he was beckoned to hasten on to the ferry-boat, which was waiting for him at the landing.

It is also said that he should have been on the look-out for the flag, uniformly displayed at the crossing when a train

was near. He did look, and he saw that there was no flag; which was a direct assurance by the, defendant that there was no engine advancing on either side within a quarter of a mile. He was forewarned of no approaching danger; and it was not to be expected, under such circumstances, that he should be forearmed with extraordinary vigilance.

The plaintiff is reproached with the fact that her husband had a shawl round his neck. It is the ordinary precaution, on a cold winter morning, of every traveler who has one to wear, and it was no more a breach of duty to this railroad company, than it would have been if he had worn a fur cap or a second overcoat.

It is claimed that he should have listened for the whistle and the bell. He did; and the fact that neither was sounded, was a further assurance by the defendant that there was no engine in motion within eighty rods of the crossing.

It is also claimed that he should have stood up in his sleigh. He owed no such duty to the defendant. It would be scarcely more absurd to hold that a footman should climb a tree or mount a fence before crossing, to assure himself that the company was not breaking the law, by sending an engine without signals, to run over travelers on a public highway.

It is insisted that he ought to have looked before him, and on both sides as he advanced. He did, for he is proved to have been a man of clear vision, and he could not avoid so looking, except by closing his eyes. He was sitting on the bottom of his sleigh, and, of course, his range of view was essentially limited; but to say that he did not or could not see whatever was within that range, would be in direct hostility to the proof. It would be as idle as it would be to assume that one who is driving down the center of State street, cannot see that there are buildings on both sides of the way — or that a Hudson river pilot cannot see both shores of the river in front of him, without turning his head back and forth in the wheel-house.

It is said that he should have observed the man who was

beckoning to him from the ferry side of the track. He doubtless did, unless the horses in front of him partially obstructed his view; and it is reasonable to assume that he understood it, as others did, as urging him to hurry on to the boat.

It is claimed that he was bound, by an inflexible rule of law, to see, to hear and to understand the two persons who hallooed; one from the station-house, and the other from the store, as he was passing between them. There is no such rule of artificial presumption, and we see no reason for its adoption, if we were at liberty to change the law of evidence. It would be an arbitrary legal intendment on a pure question of fact, without reason or truth to commend it. We have no authority to invent rules for the purpose of shielding wrong-doers. It was a question of fact for the jury, whether the testator saw and heard these men. His advanced position and his winter attire did not favor a lateral view. It is obvious that he did not hear what they said, for it was heard by no one else; and they were speaking simultaneously from opposite sides of the street. Neither of them called him by name; and if his attention was directed, as it naturally would be, to the movement of his horses, and the steep descent to the ferry-boat directly in front of them, he probably assumed that the men were speaking to each other across the street, an incident of ordinary occurrence in a country village. It is quite probable, too, that he heard simultaneously the rush of the train, as all this occurred within a few seconds of the fatal collision. His horses were under full headway; and every one who is accustomed to drive knows the difficulty of controlling even a single horse, when brought suddenly in presence of an engine, rushing upon him at the rate of forty miles an hour. It is proved and undisputed that his horses were frightened; that they sheered southwardly on the track, and that he struggled, ineffectually, to rein them back. The evidence establishes an adequate cause of death in the defendant's wrong. It affords no warrant for imputing to the testator the guilt of complicity in that wrong.

The comments made by Judge WRIGHT upon the proof, in the grossly exaggerated form which it assumed on a previous trial, have still more controlling force in their application to the evidence as now presented, when the most important portion of that then given by the defendant is abandoned. "It is doubtful from the evidence," said the learned judge, "whether, at the time the signals and hallooing occurred, the deceased had not approached so near the track that it was impossible to stop his horses short of it, even if he had heard and understood the warnings to be of the approach of the cars. This was a question for the jury; for, to have given these warnings any significance, the fact should have clearly appeared that it was in his power, by heeding them, to avoid the collision. So, also, the signals and hallooing were understood differently by the bystanders. One thought they meant to keep off; another to come on the boat; while others did not understand their meaning at all. The whole transaction must have been embraced within a few seconds of time; and the hallooing and gesticulations of the bystanders, even if observed by the deceased, were well calculated to confuse him. Those who made the motions did not understand each other. The deceased was bound for the ferry-boat, then on the point of leaving, and was hailed to come on. The hallooing proceeded from different points. Hearing no bell or whistle, and observing no flagman, the decedent might well have concluded that no train was approaching, and that the hallooing was to hasten him toward the boat. It is fair to presume that he did not hear the words spoken, as the witnesses did not hear what was said by each other. At all events, I think it was a question for the jury, whether Ernst did not understand the signals and outcries as invitations to hasten to the ferry-boat; and if he did so understand them, then I agree with the learned judge who delivered the opinion of the court in this case on the former hearing, that "they were calculated to induce him to do just what he did do, and might naturally disarm a prudent person of the suspicion of danger approaching from another quarter."

In a subsequent portion of the same lucid and able opinion, he adds:

"He had a right to assume that, in propelling their cars, the defendants would act with appropriate care; that trains would approach the crossing at proper speed; that the usual signal of approach would be seasonably given; that the managers of the train would be attentive and vigilant; that the flagman would be at his post and guard the crossing on the arrival of trains not intending to stop. Ordinary prudence scarcely dictated that he should so have conducted as to protect himself against the culpable acts and omissions of duty of the defendants' employés, in propelling a train of cars past a known station, and across a crowded thoroughfare, at the speed of forty miles an hour, ringing no bell, sounding no whistle, disregarding the look-out, and having no flagman on duty to warn of impending danger. Seeing no flagman, and hearing none of the usual signals of the approach of a train, it was not unreasonable or imprudent to conclude that no train was approaching, and that consequently there would be no danger in passing over the track. Besides, the tendency of a neglect by the employés of the company to give proper notice of the approach of the train, was to cause the deceased to be less attentive than he otherwise would have been. He was, by the negligence of their employés, in a degree thrown off his guard, and induced to attempt to cross the track apprehending no danger. The presumption is irresistible that he would not have taken a step toward hazarding his life, if he had been made aware, by the usual signals, of the proximity of the train. It is by no means clear that he did not see the train after getting west of the station-house, but too late, in the excitement and confusion of the moment, to have so controlled his horses as to have avoided the collision."

The dernier claim of the appellant, all other defenses failing, is, that the testator was guilty of culpable negligence, in not listening for and hearing the rumble on the rails, of a train which he had no reason to expect, and which gave no signal of its approach. That he did not hear it in time to

escape the collision, is so obvious that the defendants do not claim that he did; but they insist that he ought to have heard it, and that his failure to do so was a breach of duty to the company.

This theory is founded on the incidental opinions expressed by two of the witnesses, not as to the distance this train might have been heard, under the actual circumstances and with the intervening obstructions, but on the general question how far it might be possible to hear a train approaching, when omitting the customary signals in violation of law. Neither of them professed to speak from actual knowledge or observation, and their estimates were widely different. One thought it might be detected at a distance of one or two miles, and the other that it would not be audible, when the whistle would be, at a distance of seven or eight rods. It is obvious that speculative opinions, on such a question, · scarcely rise to the grade of evidence. The distance at which the approach of a train can be heard, without the signals, must depend on a great variety of circumstances, such as the structure and condition of the particular rails, the firmness of the ties, the size of the train, the direct or winding course of the track, the condition of the atmosphere, the direction and force of the wind, the shutting off of steam, the proximity of the listener to the line of the rails, the prevalence of other sounds, the acuteness of the observer's hearing, the depression or elevation of the track, the vicinity of valleys, woods and hills, the hour of the day or night, the comparative silence of the country, or the hum and bustle of city life, and the vicinity of steamboats, factories and public works. Mere speculation on the general question, without reference to these and other like conditions, is plainly idle and illusory. It is proved, as matter of fact, that though such a number of witnesses were present on this occasion, each under more favorable circumstances for hearing it than the testator, the practiced ear of the ferryman, who listened daily for the approach of the trains, did not catch the sound until the engine was within three hundred feet; Taylor, Traver, Ten Eyck, Hunter and Van

Denburgh did not hear it at all, until just as it rushed down over the crossing; the horses of Ernst did not hear it until they were close upon the track; and at the ice house, Brown did not hear it until his wagon was upon the rails, and the engine within less than a hundred feet of him.

It was because the approach of a railway train is stealthy and imperceptible, and because the sound is not readily distinguishable from others associated with no danger, that, to secure the traveler at once against needless apprehension and needless exposure, a statutory mandate was given to every such company in this State, to approach no public highway crossing with an engine, without public and distinctive signals of danger for a distance of eighty rods before passing such crossing.

The duty is plain and absolute. The company which violates it does so at its peril. If its agents are faithless, it should dismiss them. If its officers choose to disobey a law for the protection of human life, or to tolerate its violation by their subordinate agents, the remedy is in the hands of the stockholders, by selecting those who will respect our public statutes. When the illegal act results in the death of a citizen, the company must respond, unless he has been guilty of a breach of duty which contributed to his destruction. He is not guilty of such breach of duty when he assumes, in the absence of any indication to the contrary, that the company obeys the law, and that no engine is advancing to the crossing, within a distance of eighty rods, without public signals of its approach. If he is deceived by the unlawful omission of the signals, the wrong is not his, but theirs. The illegal act of the company does not, however, justify him in encountering the risk of crossing, if he sees or hears the approach of the engine, or is otherwise notified of its presence in season to avoid the peril. In that case he is guilty of culpable negligence, and the company is relieved from the responsibility of causing his death. But it is no defense to the wrong-doer that though the victim *did not* see or hear the engine and was not notified of its approach in time to avoid the collision, he *might* have seen

or heard it, if he had exercised a higher degree of vigilance, and had foreseen a violation of the law, instead of relying upon its observance. Such a theory has received countenance in a few instances in the opinions of individual judges. It has support in the *dictum* of the accomplished and able jurist who delivered the prevailing opinion in this cause on a former occasion. This question, however, was not then passed upon by the court, nor was it involved in the decision. On the proof as then presented, the question was, whether one was culpably negligent, who rode nearly a hundred and fifty feet in full view of an approaching train, who knew it to be due, and who persisted in driving against it, though notified by four persons of its presence in season to avoid the danger.

The usual argument in favor of the theory in question is, that trains are constantly passing and repassing at every railway crossing. Certainly, we are not admonished of this by the constant ringing of bells; and every man of ordinary observation knows the fact to be otherwise. If ten regular trains a day run over a given highway, they render the crossing unsafe when they pass, and only then. It is free from danger except, at most, for twenty minutes, in the aggregate, of each twenty-four hours; and the traveler is safe against exposure at those momentary intervals, if the company obeys the law and rings the bell. If it will not do that, it has no cause of complaint against the wayfarer whom it voluntarily misleads. In such a case, the language of Chief Justice BEARDSLEY is appropriate: "A man is under no obligation to be cautious and circumspect toward a wrongdoer." (*Tonawanda R. R. Co.* v. *Munger*, 5 Denio, 266.)

It is not true that a traveler on a public thoroughfare is guilty of culpable negligence, as matter of law, if he does not stop to listen, or look up and down the track before he goes over a crossing. The proposition is in direct conflict with repeated adjudications in this and in other courts. Whether such an omission is culpable, depends upon the facts and circumstances of each particular case.

There is a class of cases, in which the proof of the plaint-

iff's negligence is clear and undisputed; and whenever this appears a nonsuit is matter of legal right. A party who sees or hears an approaching engine, and chooses to take the risk of crossing before it, rather than await its passage, forfeits all claim to redress; and, under such circumstances, it is not only the right but the duty of the courts to apply the familiar rule—*volenti non fit injuria.* But there is another class of cases, in which it is equally well settled that we have no authority to impute negligence to the deceased, for an omission which may fairly be attributed to the very wrong resulting in his death.

In the case of *Brown* v. *The New York Central R. R. Co.,* decided at the last June Term, we held that no culpable negligence was established, though it was proved by the driver of the coach demolished by the collision, *that he did not look in the direction from which the cars were approaching until his horses were on the track,* the usual signal of danger not being given as they advanced to the crossing; and this, though it appeared in evidence that, if he had looked before, he would have seen them in season to avoid the collision. (32 N. Y., 597.)

The doctrine of that case was unanimously reaffirmed upon a like state of facts, at the last December Term of this court. (*Stillwell* v. *New York Central R. R. Co.*)

In the earlier case of *Megrath* v. *The Hudson River R. R. Co.*, the same rule was clearly announced. "It is not always negligence," said the court, "to cross a railroad track at times when a train is not due, or cannot reasonably be expected to pass; *nor to cross a railroad track without looking for a train,* when no signal of its approach is given by the ringing of a bell or otherwise." (32 Barb., 147.) So, also, in the case of *Warren* v. *The Fitchburgh R. R. Co.*, it was held by the Supreme Court of Massachusetts, a State in which no undue rigor of intendment is supposed to prevail on this subject, that crossing a railroad track, *without looking to see if a train is coming,* is not conclusive proof of want of care. (8 Allen, 227.)

In the case of *Fero* v. *The Buffalo & State Line R. R. Co.,*

it was claimed that the plaintiff could not recover for the injury, as it was apparent that he could readily have averted it by the exercise of greater care; but this court held that, "if he was guilty of no culpable negligence, the mere fact that he might have been more vigilant will not excuse the wrongful act of the defendants, nor deprive the plaintiff of redress for the injury he has suffered." (22 N. Y., 213.)

The question whether the plaintiff was free from negligence, in ordinary cases of this description, is one of fact to be determined by the jury, under appropriate instructions, and subject to the revisory power of the courts. Occasional instances occur, where the proof of misconduct is so clear and decisive that the judges are bound to pass on the question of negligence as matter of law. It is a mistake, however, to suppose that the decisions made, from time to time, in these two classes of cases, conflict with each other, or involve any departure from the settled rules of law. Where the question arises on a state of facts, on which fair-minded men may rationally arrive at opposite conclusions, the issue is properly submitted to the jury. Where, as sometimes happens in exceptional cases, the injury is traceable to clear and unquestionable misconduct on the part of the plaintiff, it is the plain duty of the court to apply the law to the facts without the intervention of the jury. In the present case, there is a renewal of the attempt so often made, to extend the exceptional rule to all classes of cases. It is our province to uphold the law, and not to alter it. We believe it to be wise and just; but, if we deemed it otherwise, we have no authority to subvert it. We should be restrained from making the innovation proposed, not only by our own repeated adjudications, but by that time-honored and elementary maxim on which our system of jurisprudence is founded: *Ad questionem facti non respondent judices — ad questionem legis non respondent juratores.*

The views of this court as to the right of the party claiming redress, to have the question whether he was free from negligence determined, ordinarily, by the jury, have been repeatedly expressed with great clearness and emphasis.

In the case of *Ireland* v. *The Oswego Railroad Company*, Judge JOHNSON said: "The fact of negligence is very seldom established by such direct and positive evidence, that it can be taken from the consideration of the jury and pronounced upon as matter of law. On the contrary, it is almost always to be deduced as an inference of fact, from several facts and circumstances disclosed by the testimony, after their connection and relation to the matter in issue have been traced, and their force and weight considered. In such cases, the inference cannot be made without the intervention of a jury, although all the witnesses agree in their statements, or there be but one statement which is consistent throughout. Presumptions of fact, from their very nature, are not strictly objects of legal science, like presumptions of law. That the care exercised by the plaintiff at the time of the injury, and the negligence of the defendant, were both questions for the jury to determine, cannot admit of any doubt." (3 Kern., 533.)

In the case of *Keller* v. *The New York Central Railroad Company*, Judge MASON delivered the opinion of the court, and after citing the foregoing exposition of the rule, he proceeded to say:

"What constitutes negligence in such cases, is determined by an inference of the mind from the facts and circumstances of the case; and, as minds are differently constituted, the inference from a given state of facts and circumstances will not always be the same. I admit that the facts may be so clear and decided, that this inference of negligence is irresistible, and in every such case it is the duty of the judge to decide; but when the facts, or the inference to be drawn from them, are in any degree doubtful, the only proper rule is, to submit the whole matter to the jury under proper instruction." (26 How., 177.)

Similar views were expressed by Judge DENIO in the case of *Hagan* v. *The Eighth Avenue Railroad Company*, and by Judge SELDEN in that of *Bernhardt* v. *The Rensselaer and Saratoga Railroad Company*. It was said by the latter, with the precision and perspicuity which mark all his judicial

opinions, that, "although, as a general rule, questions of' negligence belong exclusively to the jury, cases may no doubt arise in which the proof of negligence would be so clear and irresistible, that the court would be justified in assuming, without submitting the question to the jury, that negligence was established. At the same time, it is obvious, considering the nature of the question, that such instances must be rare. If there is any conflict in the evidence going to establish any of the circumstances upon which the question depends, it must be left to the jury. If there are inferences to be drawn from the proof which are not certain and incontrovertible, they are for the jury. If it is necessary to determine, as in most cases it is, what a man of ordinary care and prudence would be *likely to do* under the circumstances proved, this, involving, as it generally must, more or less of·conjecture, can only be settled by a jury." (23 How., 168.)

The struggle of defendants to inaugurate a different rule, and to induce the courts to resort to artificial refinements for the protection of wrong-doers, is, perhaps, excusable in those who are impatient of legislative restraint. There is an unfortunate and growing tendency to regard human life as of secondary importance, in comparison with the objects of commercial and corporate enterprise. The aid of the courts is invoked to annul by indirection the force of general laws. Suits and appeals multiply in the constantly increasing ratio of reckless injuries, which nothing could tend more to encourage than this theory of immunity from civil damages, on the assumption, as matter of law, that a party, over whom an engine is driven, is culpable for not keeping out of the way, and that the question, whether he was really guilty of negligence, is not one of fact for a jury.

If it be true, as is sometimes intimated, even from the bench, that false verdicts are occasionally rendered on questions like this, the remedy is to set them aside, and not to usurp the prerogative of the jury. Even among the cases which have been held so plain as to justify a nonsuit, there have been few in which the judges have not themselves dis-

agreed; and the inquiry naturally occurs to the mind, whether we are less liable than jurors to err, on questions of pure fact, pertaining to the ordinary affairs of life. Our law is framed upon the theory that, on such questions, the citizen can rely with more security on the concurrent judgment of twelve jurors than on the majority vote of a divided bench. Unanimity is not required in our decisions on questions of law. It is otherwise with jurors charged with the duty of determining issues of fact; and such issues should not be withheld from the usual arbiters, unless the evidence leads so clearly to one result that there is no room for honest difference between intelligent and upright men. A nonsuit should always be granted where the proof is so clear as to warrant the assumption, in good faith, that, if the question were submitted to the jury, they would find that the culpable negligence of the plaintiff contributed to the injury. But we have had occasion, recently, to hear nonsuits of this kind justified on the novel ground, that unless the fact be determined in one way by the judge, it will be sure to be determined the other by the jury. The correctness of judicial opinions on mere questions of fact may well be distrusted, when we find them confessedly opposed to the common sense of mankind.

The judgment should be reversed, and a new trial ordered.

HUNT, J. On the 29th day of December, 1855, Henry Ernst, while driving his horses before a lumber sleigh, came into collision with the defendants' cars, when crossing a highway in the village of Bath, in the county of Rensselaer. The plaintiff is the executrix of the said Ernst. The case has been tried three times. Upon the first trial the plaintiff was nonsuited. This nonsuit was set aside by the General Term of the third district, and a new trial granted. (32 Barb., 159.) The second trial resulted in a verdict of $2,500 for the plaintiff. The judgment was affirmed by the General Term, but, upon an appeal to this court, the judgment was reversed and a new trial ordered. (19 How. Pr., 97.) On the third trial, at the close of all the evidence, the court directed the plaintiff to be nonsuited. The defendants asked for this nonsuit on

the ground that the evidence did not establish negligence on the part of the defendants, and on the further ground that the evidence showed that the deceased was guilty of negligence on his own part, contributing to the injury complained of. The motion was resisted by the plaintiff's counsel, who requested the court to submit to the jury the several questions of fact involved in the motion and arising upon the evidence. The learned judge who tried the case declined to submit any question of fact to the jury, and nonsuited the plaintiff. The General Term of the third district affirmed the judgment upon this nonsuit, and the plaintiff now brings it to this court for review.

In making this decision at the circuit, the judge necessarily decided that, upon the testimony given, and in its most favorable aspect, and conceding to the plaintiff the benefit of all doubtful or disputed questions, a verdict for the plaintiff could not have been sustained, but would have been set aside upon presentation to the Supreme Court. If such shall be found to be the result of the evidence, the judgment must be affirmed; but if a finding of the jury in favor of the plaintiff could have been sustained, then the judgment must be reversed.

The only questions of fact which it will be necessary to examine are those of negligence: first, of the defendants; and next, of the deceased. The proof is in many respects different from that upon the former trial, as recited in the opinion given in this court by Justice E, D. SMITH, and that opinion is not, therefore, controlling on the present questions. On the question of the defendants' negligence, I entertain no doubt that there was evidence on which the jury would have been justified in finding this point against the defendants. The speed of the train, whether it was on or off time, whether the bell was rung and the whistle blown, as required by the statute, the absence of a flagman, where one had been accustomed to be stationed, the failure of the engineer to look ahead to the left, the presence of Waltemyre on the engine, whether authorized or unauthorized, were questions which would have afforded the jury room for a fair exercise

of their judgment, and their decision would not have been disturbed if it had been in favor of the plaintiff.

The principal question, however, arises upon the other point, of concurring negligence on the part of the deceased, contributing to produce the injury. The facts as proved, and as the jury would have the right to infer them to be, exercising their power of finding all doubtful points in favor of the plaintiff, may be stated as follows:

On the day in question the deceased drove his empty sleigh, with a pair of horses, into the village of Bath, intending to cross the ferry to Albany. The boat was not ready, and he fastened his horses in front of the tavern and went in. In a short time notice was given that the boat was ready, his associates crossed over the track in their sleighs, one of them remaining near the track to assist the deceased, the others reaching the boat; the deceased came out, unhitched his horses, sat upon the bottom of his lumber sleigh, drove northerly a few feet, turned westwardly, drove one hundred and twelve feet toward the ferry when he reached the railroad track, when his horses were struck by the engine and cars going southwardly, his horses killed, and himself so badly injured that he died within a few days thereafter. As he drove northwardly from the hotel, he could see up the railroad a distance of thirty rods. After turning westwardly toward the ferry and going a short distance, the view of the road northerly was cut off by the station-house, a building extending about fourteen feet in a direction easterly and westerly. As the deceased approached the train, he was driving on a moderate trot; he was shouted at three times by a man standing on the steps of a store adjoining the track, that the cars were coming, to which he paid no apparent attention. Whether he heard or understood, does not appear. One of the railroad hands east of the track made motions to him, intended by the maker as signals to stop, and one of his own comrades, Simmons, on the west side of the track, made signs intended by him to effect the same purpose. The deceased drove on at a moderate trot till he reached the track. The train, as one witness testi-

fied, was running at a speed of forty miles per hour, which would carry the train over the thirty rods in about eight and a half seconds, and over fifty rods in about fourteen and one-sixteenth seconds. The deceased was a frequent passer at this place, and it had been the established custom there for some years that a flagman, with a white flag, should signal the approach of cars not intended to stop, and with a red flag when the train was expected to stop.

These are the substantial facts bearing upon the point now under consideration. The cases in this court, of *Wilds v. The Hudson R. R. Co.* (29 N. Y., 315); *Brown* v. *N. Y. Central R. R.* (32 id., 597); *Newson* v. *The Same* (29 id., 383); *Steeves* v. *Oswego & Syracuse Railroad Co.* (18 id., 422); and in Pennsylvania, of *North Pa. R. R. Co.* v. *Hilman* (49 Pa., 60), contain the recent expositions of the law now to be examined. The case of Steeves decides that gross negligence in a person injured at a railroad crossing, by a passing train, will defeat his action for damages, notwithstanding the omission of those running the train to ring the bell or sound the whistle, as required by law. In that case, as the facts are stated in the opinion of the court, there was nothing whatever to excuse the injured party both from seeing and hearing the approaching train; while riding for about a mile parallel with the track and in plain view, he would seem to have closed his eyes and ears, and to have driven across or upon the track as a train was approaching. An injury received under such circumstances, the court held to be the result of his own reckless indifference, for which he could not recover against the railroad company whose train had caused it.

In the case of *Newson* v. *N. Y. Central* (*supra*), the finding of the jury in favor of the plaintiff was sustained, although it appeared that the deceased drove and remained with his horses in a dangerous place; that he had a previous difficulty with his horses at the same spot, in the earlier part of the same day, and that he was warned by the flagman that it was dangerous, and that he must not remain there with his horses. It appeared, further, that he was at the

point designated by the defendants for the business in which he was engaged, that of receiving gravel from the cars, and the court held that it was a plain duty of the defendants not to expose him to danger while there, and that it did not lie with them to say that he was guilty of negligence in going there. It was not absolutely necessary, the court say, that the defendant's cars should have been run so near to his horses, and they held that such running was a clear act of negligence, for which the company was liable. I think this case holds that the question of the negligence of the deceased is not an isolated question, but is mixed with, and depends for its solution, in some manner, upon the question and degree of the defendant's negligence.

*Brown* v. *The N. Y. C. R. R.* (*supra*) was an action brought by the plaintiff to recover damages for injuries sustained by the plaintiff, by a collision of the defendant's cars with a stage-coach in which she was a passenger. The view of the track was so much obstructed by houses and trees that a train approaching the village of Albion could not be seen until the traveler was within a few rods of the track. The driver heard the train approaching and stopped his horses. As it was passing, he started up toward the track, when a single car, separate from anything else, also came by. He again stopped, waited till it passed, and again started up. His horses had now reached the rails, when he saw still other cars approaching from the same direction. He whipped his horses with the intention of crossing before they reached him, but his hind wheels were struck, the coach upset and the plaintiff's injuries received. The separate cars following each other so rapidly, was the result of what is called a running switch, for the purpose of leaving one car out of the train. The defendants claimed that, upon the undisputed facts, the plaintiff's driver was negligent and that she could not recover. The court held that upon these facts it was not error to leave it to the jury to say whether the driver was negligent; that it was for them to say whether he could more safely have drawn back than whipped up; that, under such circumstances, the party who put him in jeopardy is

responsible, and not he, if he mistook the safest means of escape. On the question of negligence in not having seen the cars approaching, the court say that that was also for the jury. He had seen a train pass and had waited for it. He had also waited for a single car to pass. His eye followed them, and " was he bound to suspect that more were coming, and to be on the look-out for them? I think it is asking too much to say that it was negligence, as a matter of law, not to have anticipated that they were following. The signals of the train had told him where the danger was, but gave no warning of unsignaled danger to follow." This authority also connects the question of the plaintiff's negligence with the acts and omissions of the defendants and their agents.

In the case of Wilds, it appeared that the deceased drove his horses upon a railroad where it crossed the street, the bell rang and the whistle sounded; a flagman stood in the center of the street waving his flag; some persons hallooed to him, and others tried to seize and stop his horses. He saw the engine coming, but raised his whip and attempted to pass before it. He failed, and was killed. This court ruled, as a matter of law, that no action would lie by his administratrix against the railroad company, on the ground that the exercise of ordinary discretion and prudence by the deceased would have discovered the advance of the train, and would have effectually preserved him from danger.

The Pennsylvania case decides that it is the duty of a traveler approaching a railroad crossing to look along the line of the railroad and see if any train is coming, and that if he failed to take such precaution it was more than evidence of negligence — it was negligence itself, and that the jury should have been so charged.

Did the facts, as I have collated them, in the present case, exhibit necessarily an absence of that ordinary prudence and discretion, or was there such room for question as that the case should have been left to the determination of the jury? The question of negligence is usually one of fact for the jury. (2 Starkie on Ev., 973.) What constitutes negligence is a pure question of fact for the jury to decide. (Ang. on Car.,

§§ 7, 16, &c.; Story on Bail., § 11; Greenl. on Ev., § 48.) And it does not follow, necessarily, where there is no conflict of evidence, that the court is to decide the issue. (*Ireland* v. *Oswego R. R. Co.*, 13 N. Y., 533; *Oldfield* v. *N. Y. and H. R. Co.*, 14 id., 310.) What constitutes negligence in a particular case is generally a question for the jury, and not for the court, because negligence is want of ordinary care. (49 Penn., *supra.*) These authorities are not in conflict with those which hold that, in certain cases, the courts rule the question as one of law, as where the evidence so clearly shows the want of prudence and discretion that there can be nothing for the jury to pass upon. Assuming that the conduct of the deceased, on the occasion in question, indicated negligence on his part, there are still some considerations to be noticed. The first is this: when the deceased started northerly from the tavern, and when he turned westwardly, toward the track, his eye would have covered the track for a distance of thirty rods. This was as far as he could see upon the railroad, and I think he was bound to survey this space. As I have already stated, this train, moving at forty miles per hour, would have passed over this thirty rods in eight and one-half seconds. Now, I think it was for the jury to say whether he had not found, by observation, that the track was clear, so that he could safely pass over it, and that the train came over this space and come upon him while he was passing over the space covered by the station house, and where his view of the road was obstructed. The jury would be quite competent to say whether, at the moderate rate at which he was going, this inference might fairly have been drawn, and the conclusion thus reached, that it was not his own want of attention that produced the catastrophe. I think it should have been left to them, upon that view.

Another consideration arises upon the point, whether it was entirely certain that the deceased understood, or was bound to have understood, the meaning of the shouts, the motions and gestures that were made to him. The ferry-boat was ready, his comrades had reached it, and were detaining

it for him, and his crossing the river was the prominent idea in his mind. One man was on the west side of the track, which was nearest to the ferry, making gestures and motions, and others upon the east side were also shouting and making motions. It is possible that the deceased may have misinterpreted these attentions, and understood them as designed to hurry him on to reach the boat, and this, too, with the exercise of ordinary prudence and discretion.

A third consideration, and which affects those I have already mentioned, and is to be considered in connection with them, was the absence of a flagman, when the deceased attempted to cross the track. A man had usually been stationed there, to warn off travelers by his flag, when there was danger from an approaching train. The deceased was for many years accustomed to travel the road and to cross at this point. How far, then, the knowledge of the deceased extended as to this practice, whether he looked for the flag, and, not finding it exhibited as usual, relied upon its absence as evidence that the track was clear, and that he could safely cross, whether it was prudent and discreet in him to rely upon its absence, or whether he was still bound to exercise other precautions, and to take other means to satisfy himself that no train was at hand, whether his construction of the shouts, gestures and motions was to be affected by this absence of the flag and his knowledge of it, and its effect upon his examination of the road, were, I think, questions that should have been submitted to the jury. Without intending an intimation that the jury should or would have found in accordance with these suggestions, and intending to observe the principles laid down in Wilds and Steeves heretofore cited, I think an error was made in withdrawing the case entirely from the consideration of the jury. There should be a reversal of the judgment of the General Term, and a new trial ordered.

All the judges concurring,

Judgment reversed and new trial ordered.