ANNA M. COOK, ADMINISTRATRIX OF JOHN F. COOK, DE-
CEASED, *v.* THE NEW YORK CENTRAL RAILROAD CO.

*Nonsuit—Presumptions for Plaintiff—Negligence—Railroad.*

On a question of nonsuit, all disputed questions of fact are to be decided in favor of the Plaintiff; and all presumptions and influences which he had a right to ask from the Jury, are to be conceded to him.

In the management of a railroad and machinery, the railroad corporation is bound to use the utmost care and vigilance to avoid the dangers attending a collision.

The party injured was required to exercise only the ordinary prudence and attention which sensible men are accustomed to give under similar circumstances.

On the 17th of September, 1864, John F. Cook and John Van Brunt were returning from their work, in a one-horse wagon. Their course was northerly up Hamburg Street, in the city of Buffalo. While crossing the Defendants' railroad, as it passed over that street, the wagon was struck by a train of cars, which was backing toward the city of Buffalo. Both the occupants of the wagon were thrown out, and Cook was instantly killed. The Plaintiff, as his administratrix, brings this action to recover damages for such killing. On the trial at the Circuit the Plaintiff was nonsuited. The General Term of the Eighth District affirmed the judgment entered upon this nonsuit, and the Plaintiff now appeals to this Court. The facts are stated in the opinion of the Court.

• *John C. Strong* for Appellant.

*A. P. Lanning* for Respondent.

HUNT, J.—Two questions were presented upon this trial. First, were the Defendants guilty of negligence on the occasion in question? Second, was the deceased free from negligence?

To justify a nonsuit, one of these questions must be held against the Plaintiff, and so clearly that there is no room for doubt. On a question of nonsuit, all disputed facts are to be

decided in favor of the Plaintiff, and all presumptions and infer-
ences which he had a right to ask from the jury are to be con-
ceded to him.   As we have frequently and recently held, we do
not weigh or measure the evidence.   That is the province of the
jury.   If there is evidence in favor of the Plaintiff's claim, on
which the jury would have been justified in giving him a verdict,
it is not for the Court to say whether it has been overbalanced
or outweighed by the conflicting testimony.

(Solms *v.* The Rutger's Fire Ins. Co. and railroad cases cited,
post.)

It appeared in evidence that the train approached the crossing
in question by a curve, and that the view in the direction from
which it came was cut off by houses and by a high fence.

It appeared that the deceased and his companion, who is now
also dead, were sober, steady men, and that they were sober on
the evening in question.   They approached the crossing slowly,
in the dusk of the evening, and, as it appeared by the evidence
of five witnesses, there was no flagman visible at the station, and
no warning was given that it was not safe to cross, although a
flagman was regularly stationed at that point for the purpose of
preventing the passage, when it was unsafe to cross.   It appeared
by the evidence of four witnesses that no bell was rung upon the
approaching train, and that no whistle was sounded from it until
the collision took place.   An ordinance of the city of Buffalo
was introduced in evidence, by which trains were prohibited from
passing this point at a rate of speed greater than that of six miles
per hour.   It was proved by several witnesses that this train
was crossing at a rate of speed equal to eight or ten miles per
hour.

The Defendants, on the other hand, proved by the fireman of
the train that the train was crossing at a speed not exceeding
five miles per hour, that the whistle was blown twice, and that
the bell was rung as they crossed the street.   He further testi-
fied that Scanlin was the regular flagman at this point, but that,
on this occasion, one Sullivan stood near the track, and about ten
or twelve feet from the shanty on Hamburg Street.   Another

fireman testified to the same facts, except that he testified that he did not see a flagman there; that he did see a cripple there, but that he did not know Sullivan. The first of these firemen stated that he remembered that they rang the bell at the crossing, because they always did ring the bell at such a crossing. The other testified that he fixed the rate of speed at which they crossed, from the fact that they always came slowly around the curve, and he fixed it on this occasion from that usual way. The conductor was also sworn, and he testified that he discovered the wagon on the track, and whistled, or signalled to brake down. " The man was stopped there, but he started again, and I immediately hallooed to him to hold on, and then I ran to the second car, and I had not more than got there than they blowed the second whistle . . . ; the men came to a full stop when they saw the train, but they jerked the lines again and started, and as quick as I saw them I hallooed, because I saw they could not cross safely; I hallooed to them to hold on, and gave a signal to brake and stop the engine. With reference to Hamburg Street, the men were in the middle of the road; I think the fore part of the horse was pretty near on the southern part of the track; the cars are thirty feet in length." On his cross-examination he said : " When I first saw them they were driving on the track, and had stopped; I was within four cars' length of Hamburg Street. When I first saw them they were driving up the track ; I told them to stop ; I was four cars' length from them ; they stopped on the south track ; the wagon was in the centre of that track when I first noticed them." Daniel Sullivan testified that Scanlin was the flagman at this point, and that, at his request, he held his flag for him while he went to his supper, on the occasion in question ; that he saw the horse and wagon coming up the street, and saw the train approaching, and, waving his flag under the horse's nose, stopped the wagon for about ten minutes ; that the man said the horse should go through, whipped him up, and he went on the track. Thomas Smith and Rosina Smith corroborated Sullivan in the most important portions of his testimony. Other witnesses were called to discredit Sullivan's

evidence, one of whom testified that Sullivan had said to her that he knew nothing about the accident, that he was in the shanty, and that he knew nothing about it.

The rule is quite well settled, that in the management of their road and machinery, a railroad corporation is bound to use the utmost care and vigilance, to avoid the dangers attending a collision. It is equally well settled, that the freedom from negligence which is required of a Plaintiff, involves only that ordinary prudence and attention which sensible men are accustomed to give in similar cases.

Perfect composure in danger, entire self-possession, and an accurate decision upon the evident course to be adopted on the emergency, are not required.

The recent elaborate discussions in Ernst *v.* The Hudson R. R. Co. (35 N. Y. 9), Beisiegal *v.* The N. Y. Central (34 N. Y. R. 622), Mackay *v.* The N. Y. Central (35 N. Y. R. 75), Brown *v.* The N. Y. Central (34 N. Y. R. 405), render it unnecessary to re-examine either the authorities or the principles upon which this case should be decided. Upon those cases the question upon each of the points I have mentioned should have been submitted to the jury, and their decision would have been conclusive. Indeed, upon the evidence of the Defendants' conductor himself, I think it was a case for the jury.

It was for them to decide upon the conflicting evidence before them as to the Defendants' negligence. It was for them also to draw the conclusions whether the Plaintiff was in fault; whether and how he could have escaped the imminent danger that pressed him; and whether he heard or understood the directions or signals that were given to him.

I think there should be a new trial, with costs to abide the event.

All concur, except DAVIES, Ch.J., and GROVER.

GROVER, J. (dissenting).—The only exception as to the admissibility of evidence taken was, that of the Plaintiff to the rejection of testimony showing what Van Brunt swore to in

relation to the transaction before the coroner's inquest. Van Brunt was in the wagon with the Plaintiff's intestate, and driving at the time of the collision. Van Brunt was dead at the time of the trial, and the Defendant had counsel before the inquest. It is settled in civil actions that, when a witness has been sworn upon a previous trial between the same parties or their privies, upon the same issue, and has died before the pending trial, proof of what such witness swore to upon the former trial is competent. This is the extent of the rule. The evidence offered in the present case does not come within the principle. Here there was no cause pending between these parties at the time Van Brunt was sworn. Neither party could in any way be affected by any result of the inquest, nor was such inquest admissible in evidence for or against either party in this case. Although in some ancient cases it has been held that such testimony was admissible upon the trial of an indictment, there is no precedent for admitting it in civil suits. Neither the parties or issue is the same. The evidence was properly rejected.

The more material question arises upon the exception of the Plaintiff to the nonsuit ordered by the Court. This presents the question, first, whether there was such a failure of proof showing negligence in the Defendant as that a verdict finding such negligence would be set aside; and second, whether a verdict exonerating the Plaintiff's intestate from negligence would be so much against the weight of evidence as that it would not be permitted to stand.

A determination of either of these propositions in favor of the Defendant will sustain the nonsuit (Wilds v. The Hudson River R. R. Co. 24 N. Y. 431; Johnson v. Same, 20 N. Y. 73). The same rule has been held by this Court in other cases, and in this respect (if in any) these cases have not been overruled.

The negligence imputed to the Defendant is, that there was no flagman at this crossing at the time of the collision; 2d, that the train was running faster than permitted by the ordinance of the city of Buffalo; and 3d, that the bell was not rung. As to the first question, it was proved that there was usually a flag-

man kept by the Defendant at this crossing. The evidence as to his being there at the time of the collision in question was conflicting, and as to that I think it presented a fair question for the jury in that respect. But there was no law for making it the duty of the Defendant to keep a flagman there. In the absence of such law I do not think negligence can be imputed to the Defendant for the omission. Crossing a railroad in the country where there is no flagman is equally dangerous as it is to cross in the city, in the like absence, although the number crossing may be much less.

The law has imposed upon railroad companies the duty of making such signals and giving such warnings as it deems adequate to the security of the public, and neither courts nor juries have any right arbitrarily to impose others. If courts or juries are authorized to impute negligence from a failure to keep flagmen at any particular station, no determinate rule can be prescribed excusing them from so keeping them at others. The amount of travel at the crossings varies greatly at particular seasons and on particular occasions. As above remarked, there is as much danger encountered by each person crossing the track where there is but one hundred crossing in a day as there is where a thousand cross. While the presence of flagmen may to some extent reduce the danger, it would be still more reduced by closing a gate at the crossing while trains were passing, as is done in some countries in Europe. No one insists that they are bound to do the latter.

The decided weight of the evidence is, that the train was not running six miles an hour, the rate permitted by the ordinance of the city. Two or three witnesses testify it was running faster than usual, but it is evident that their observation was such as scarcely authorized them to speak upon this point; while those on and in charge of the train testify positively that it was running very slow—not five miles an hour—and the short distance within which the train was stopped, after the signal so to do, demonstrates that these latter witnesses were correct.

Some four witnesses testified that they did not hear the bell

ring; not one of them testify that they listened for the purpose of hearing, or were paying any attention to whether it was ringing or not. Three witnesses swear positively that the bell was ringing. No conflict was presented by this evidence. Testimony of a witness that he did not hear the bell ring is no evidence at all, unless he testifies that his attention was directed to the matter. It is a case where affirmative evidence is to prevail against negative, for the reason that the former knows the fact, and the latter does not know it. These latter testify honestly that they did not hear, although the bell was ringing, while the former are guilty of perjury, unless the fact was as stated by them.

I think the evidence failed to show negligence in the Defendant or its employees.

Upon the question of negligence in the Plaintiff's intestate, it is settled that the negligence of Van Brunt, the driver with whom he was riding, was imputable to him (Brown *v.* N. Y. C. R. R. 32 N. Y. 597).

The evidence showed that the approaching train might have been seen by persons in the wagon while approaching the track, so as to have avoided the collision by looking up and down. It is true that there were some buildings that prevented a view of the entire track, but the evidence shows that sufficient could be seen by attention, while passing along in the wagon, to have prevented the collision. It is conceded that, if the intestate's negligence contributed to the injury received, he cannot recover, although the Defendant was guilty of negligence. In Ernst *v.* The Hudson R. R. R. (32 Howard, 61), it was remarked in the opinion of the learned judge in this Court, in substance, that if the traveller, upon approaching a crossing, does not hear the bell ring, he may assume there is no train within eighty rods, and that he is not, therefore, guilty of negligence in going on the track, although, by looking, he could see a train approaching so near that it was dangerous so to do. The reason upon which the remark is based is, that the law makes it the duty of those in charge of the train to ring the bell continuously within that

distance of the crossing, or in default blow the whistle, and that a failure to do either is an assurance that may be relied on that there is no approaching train within the prescribed distance. Similar remarks are found in the opinions in several other cases in this Court, but in none of the cases does the point appear to have been so adjusted. In Wilds *v.* The Hudson R. R. R. (supra) the direct contrary is said in the opinion, and in several other cases in this Court. So that, upon this point, there is a conflict in the views of learned judges. All agree that the party crossing the track must use ordinary care, or he is guilty of negligence that will prevent his recovering for an injury, although the company may be guilty of negligence.

The inquiry then is reduced to this: Whether it is ordinary care for one to venture upon a railroad track, although no bell may be ringing or whistle blowing to advertise an approaching train, without looking, when the track is visible, to see whether there is such train. Care is imposed, and must be exercised. Is this performed by simply listening for the bell or whistle, when, by the use of the eye, without trouble or inconvenience, the real condition can readily be ascertained. I think it borders upon rashness to go ahead, omitting this easily available means of avoiding danger. It is said, Will you require this vigilance in behalf of a wrongdoer? My answer is, that the omission to look under such circumstances makes the party guilty thereof a wrongdoer, and, if injury arises to either, it is the result of the acts of two wrongdoers. If either is injured in consequence of the wrongful acts of both, the law will not allow either to recover.

It is said that a regard for human life requires that railroad companies should be held strictly to the performance of their duty in giving the requisite signals at crossings. To this I agree. The same regard requires that all persons at such crossings, knowing the great danger inseparable from collisions, should exercise their senses of sight and hearing, in order to avail them. To omit this, and heedlessly rush upon a track at any time, is a wanton exposure that no prudent person will be guilty of. To rely blindly upon the strict performance by others of their legal or

moral duties, in matters seriously affecting life and limb, or any important interest, is not the course of prudent, cautious men, and, when this has been done, the party suffering an injury therefrom should attribute it, at least in part, to his own want of care. Human nature is too imperfect to render such reliance safe.

The law evinces its regard for human life and safety, not by awarding compensation for injuries sustained by the mutual carelessness of parties, but by punishing criminally those through whose neglect the injury has been inflicted.

In all cases where death has been caused by the neglect of those in charge of trains to give the signals required by law, those whose duty it was to give them may be punished criminally for the homicide.

To this charge the fact that the negligence of the deceased had contributed to his death, would constitute no defence. One conviction upon such a charge, would go further in securing a performance of duty by railroad employees than many recoveries in civil actions. It is not, therefore, necessary to innovate upon settled legal principles to protect the public.

The only remaining question is, whether it is the duty of the Court to submit the question to the jury as one of fact, or to dispose of it as one of law. It is the legal right of parties to have all questions of fact determined by the jury. It is equally their right to require the Court to determine all questions of law. An application of these rules requires the judge, when there is a doubt whether the party, by looking, could have seen, or by listening could have heard, the train in time to have avoided the danger, to submit these questions to the jury; but, when the proof clearly establishes the affirmative of these propositions, or either of them, the only question is, whether it is negligence to go upon the track without looking or listening. This I conceive to be clearly a question of law, to be determined by the Court. In this way only can there be any uniform rule. It it said that it should be submitted to the jury to determine whether people generally were not in the habit of so doing, with the instruction that if they were it was not the omission of ordinary care so to do.

Who ever heard of any testimony being offered upon such an issue? Is it said the jury are to determine from their own knowledge? The answer to this is, they have no knowledge, except their individual experience, and many juries rarely cross a railroad. Prudent juries, exercising care, would determine the question one way, while those of a different character and habit would determine it the other.

I think, when it appears that, by looking, the train could have been seen, and the party has gone upon the track, negligence has been conclusively shown, and the Court should so pronounce.

My conclusion, therefore, is, that the nonsuit was properly granted, upon the second ground, and that the judgment should be affirmed.

Reversed, and new trial ordered.

JOEL TIFFANY,<br>State Reporter.