DAVID KINNEY v. FOLKERT C. FOLKERTS ET AL.

*Master and servant—Negligence—Damages—Evidence.*

| 78 | 687 |
|----|-----|
| 84 | 618 |
| 78 | 687 |
| 90 | 609 |
| 78 | 687 |
| 107 | 503 |
| 78 | 687 |
| 110 | 268 |
| 78 | 687 |
| 121 | 228 |
| 78 | 687 |
| 154 | 1430 |

1. If a defendant (in a negligence case), by his own act, has thrown the plaintiff off his guard, and given him reason to believe that vigilance was not needed, its lack on the part of the plaintiff is no bar to his claim.  *Railroad Co. v. Ogier*, 35 Penn. St. 60;

*Ernst v. Railroad Co.*, 35 N. Y. 9; *Totten v. Phipps*, 52 Id. 354; *Morrissey v. Ferry Co.*, 47 Mo. 521.

2. In a negligence case, where the injury was permanent in its character, the court, in charging the jury on the question of damages, used the following language, in substance: "Perhaps a nearer rule—and I do not give it to you as a controlling rule —would be such a sum of money as, put at six per cent. interest, might earn a sum equivalent to the difference in plaintiff's wages before and after the accident. To illustrate, if he could have earned $600 a year before, and can now only earn $300, a sum of money that, at the ordinary rate of interest, would produce $300 per year would fully compensate him for his loss. Perhaps this would be too large an amount, because you should take into consideration the contingencies of ill health, the inability to secure work, and other contingencies incident to human life." The court is held to have erred in using the illustration, for if the jury might give an amount which, thus placed at interest, would produce the amount representing the loss in plaintiff's earning capacity, it would be a perpetuity, which he is not entitled to have.

3. Where in a negligence case a witness for the defendant testified that plaintiff told him that he bid not know how he came to be injured, it is error to allow the plaintiff to testify, on rebuttal, that at about the time of the alleged statement he stated his case fully to his attorneys, and substantially as testified to upon the trial, in which testimony he explained fully how the accident happened.

4. A statement by an employer, soon after an accident to an employé, " that he would see him through all right, and not to worry," is in no sense a confession or admission of liability, and evidence of the making of the same is inadmissible in a suit for damages by the employé.

Error to Alpena. (Kelley, J.) Argued November 7, 1889. Decided December 28, 1889.

Negligence case. Defendants bring error. Reversed. The facts are stated in the opinion.

*Frank Emerick (John C. Shields, of counsel), for appellants.*

*Turnbull & Dafoe (Depew & Rutherford, of counsel), for plaintiff.*

[The opinion states and discusses the points of counsel.
—REPORTER.]

LONG, J.   The declaration in this cause contained three
counts.

In the first it is alleged, substantially, that the defend-
ants, under the firm name of Luther, McNally & Co.,
were, on October 8, 1888, at Alpena, engaged in carrying
on a planing-mill, and running and using in said mill a
certain machine, called a "fan," for the purpose of
sucking up and blowing the shavings made at said mill
to various places; that such fan is composed of a wheel,
with arms, incased with a covering, with certain pipes
attached thereto, said fan being driven by certain pulleys
and belts, and revolving at great speed; that, plaintiff
being on said day engaged in repairing and changing the
pipes attached to said fan, he notified the defendants to
stop said fan, and not allow said fan to be started or
put in motion while he was repairing the same; that
defendants did stop the same, and promised plaintiff not
to start the same for one hour, or while plaintiff was
working around it; that as soon as said fan was stopped,
and became motionless, he proceeded with said repairs,
detached the pipes from said fan, when the defendants,
within said hour, ordered plaintiff to replace said pipes,
and re-attach the same to the fan, which he proceeded to
do; that the defendants, without notice or warning to
plaintiff, wrongfully and negligently started the fan, and
put the same in motion, and, while the plaintiff was
engaged in replacing and re-attaching said pipes, without
fault or negligence on his part, the fan then struck and
came in contact with the plaintiff's left hand, crushing
and mangling it, etc.

The second count charges that after he had removed
the pipes he was ordered by the defendants to replace the

same; that it was the duty of the defendants not to run said fan while he (plaintiff) was so re-attaching said pipes, yet the defendants carelessly and negligently ran said fan while the plaintiff was so engaged by order of defendants, by reason whereof the said fan came in contact with plaintiff's hand, greatly injuring it, etc.

The third count charges that it was the duty of defendants to keep said fan and machinery motionless while he was so replacing said pipes, and also to give plaintiff notice of the starting of said machinery and fan, yet the defendants, well knowing their duty, negligently disregarded the same, and did then and there, while the plaintiff was so engaged in re-attaching said pipes, without notice or warning to plaintiff, start and run said machinery and put the same in. motion, thereby crushing and mangling plaintiff's hand, etc.

On the trial in the Alpena circuit court, plaintiff had verdict and judgment for $5,000. Defendants bring error.

The claim made in this Court is that the proofs do not support the declaration, and that the plaintiff's own testimony shows him guilty of such negligence that he is not entitled to recover. Some errors are also claimed in the admission of evidence and the charge of the court, as well as the refusal to charge as requested by defendants' counsel. These claims will be noticed further on.

On the trial the plaintiff gave evidence, in his own behalf, tending to show that he was a machinist, and had been working around the defendants' mill for some time, and had put up the blower, and attached the pipes for its effective working. The blower was encased in a box, was made of a wheel with paddles, something like a water-wheel, with a pully on each side, outside the box, to which the belts were attached to drive it; and the wheel made about 2,000 revolutions per minute. On the

morning of October 8, 1888, plaintiff went to the mill, and defendant McNally wanted the pipes to the blower fixed. These pipes were attached to the outside of the box, and fastened against and to it with bolts or nails put through the flange of the pipes and a flange projecting from the edge of the box, on either side, and extending from the box, about eight feet from the floor, to the floor of the mill. These pipes were unbolted and taken down by the plaintiff on that morning, at the request of the defendant McNally.

Some contention arises here whether the pipe through which the plaintiff claims to have extended his arm at the time of the accident was a continuous pipe, reaching from the box to the floor, or whether it was one which had a joint some two feet from the box, the short, upper piece being an elbow which fastened to the box. The claim of the plaintiff is that there was such a joint or elbow, which he slipped apart at this joint, while the contention of the defendants is—and a great amount of testimony was given by defendants upon this point—that the pipe was a continuous one from the box to the floor, and contained no joint, and was not taken apart on that morning.

Plaintiff testifies that after the defendant ordered him to fix the pipe, and alter it so it would be placed over the shaft, he then told defendant he would have to stop the fan, when the defendant said, "All right. I will do so" (using the language of the plaintiff).

"So he shut down the mill, and was standing with me, and took off the belts of the blower, and immediately started running it again, and left the blower stopped; and I went to work and took the pipes down, and told my brother to take the pipes that I was to alter out in the shed adjoining, a few feet, where I was doing this work, and I stayed in, and told McNally not to put the belt on for an hour, and the boy (Sam Clark) said,

'Can't you do it quicker?' I said, 'No, sir,' and he said, 'Why?' or something like that.

"McNally was then present. They stayed while I was taking the pipes down. Then I took a pipe, and leaned it up against the wall,—just a temporary pipe he had,—and took that and stood it on the floor, and said: 'There is no pipes for their shavings, and there is no use in running it; and when I am done I will notify you I am through.' So I went right along where my brother was, and was out there five or ten minutes, and Mr. McNally came along, and he said: 'Kinney, I want you to come in here and fit that temporary pipe—I want to start the blower—as quick as you can.' I said, 'All right,' and we both run right in quick, and I took this elbow and stuck it in the blower, and had the bolts in my hands, and jumped onto a horse, and run my hand right in the blower, and had my fingers clipped just like that. I pulled my hand out, and slung the elbow on the floor.

"Q. Did you know, at the time that you went in there with McNally, anything in reference to their having started the blower again?

"A. No, sir. It was just the same as I left it,—just from a glance,—just the same as I left it.

"Q. That is what you supposed?

"A. Yes. The pipes were off, and there wasn't nothing for making a noise,—no whistling or making a noise or anything, so you would hear it. If the pipes had been on, I might have heard the suction of the wind, but they wasn't.

"Q. If you had information that they had started that fan again, state to the jury whether you would have attempted to put on that pipe again.

"A. No, sir; I wouldn't, because you couldn't do it without getting your hand taken off. There is only that half-inch flange in there; and, if you put your hand through, you would get it taken off.

"Q. Did McNally, or any one of the other gentlemen there, say anything to you, or give you any notice that they had started that machinery again?

"A. No, sir. There was nothing said about it.

"Q. Had you any knowledge or notice at the time you went in there, and, if so, what, of the starting of that machinery again?

"A. No, sir. I didn't know nothing about it."

On the cross-examination of the plaintiff, it appeared that there were two belts to drive the blower,—one on each side,—which ran down from a main shaft to pulleys outside of the box, and on either end of the shaft running through the wheel to which the paddles of the blower were attached. These belts were the only motive power of the blower, and, when in position to drive it, were within a few inches of the opening to which plaintiff was attempting to fasten the pipe. The pipe itself, as plaintiff claims, which he was attempting to put on, was an elbow some two feet in length, the part turning towards the side of the blower being only a few inches in length, and through which holes were made,—the bolts going through this into the flange on the side of the box; that, running in hurriedly, he stepped upon a sawhorse, to bring himself within reach of the box, put his arm through the pipe,—from the bottom upwards,—to feel for the bolt-holes; and, not knowing the fan was in motion, he extended his hand through the hole in the side of the box, and among the fans, and was injured. His attention being called, upon his cross-examination, to his care in going there, and his attempt to fasten the pipe on, he stated that he did not look to see if the blower was running.

The testimony of the plaintiff, while corroborated in most particulars by that of his brother, is disputed by the defendants, and several other witnesses, in almost every essential particular; Joseph McNally and others testifying that the blower was not stopped that morning for the purpose of fixing the pipes, and they further testifying that the pipe did not have a loose elbow, but was fastened together for its whole length, and was put on by nails put through the flange of the pipe and the flange on the box. Mr. McNally says that on that morning, finding that the pipe was not in place, and Sam Clark

sweeping up the shavings from the floor preparatory to blowing them out, he inquired of Kinney, the plaintiff, who had come into the mill a few minutes before, where the pipe was; that he found the plaintiff in the shop, and asked him where the pipe was, and he said: "Oh, yes; I will go and get it." Then he turned, and went out of the shop, and out of the mill, and did not see plaintiff again until after the injury. That at the time of his asking for the pipe the fan was running, and had been all the morning.

If the testimony offered by the defendants is true, the plaintiff was guilty of gross carelessness in rushing in there and putting his hand into the fans of the blower. If the pipe was whole, and did not have this loose elbow which plaintiff claims, then the plaintiff could not have been injured as he claimed, as he could not have run his arm through the pipe and into the blower; the pipe being some seven or eight feet in length. But, in considering the questions raised by counsel for defendants, we must treat the case as made by the plaintiff's own evidence, however much we might have disagreed with the jury upon the proofs made by the evidence offered by both sides upon the points in controversy. That the plaintiff is seriously injured there is no disagreement.

Taking the facts, then, as they are made to appear by the plaintiff's testimony, the plaintiff was as familiar with the situation and surroundings there as the defendants. He had put up the blower and made the pipes. The blower was fastened to the timbers of the mill above the floor, and some 9 or 10 feet above it, and was driven by these two belts from a main shaft. One needs but little experience in machinery to know that a blower of that size (a model was produced before us as an exhibit), when driven by steam-power and making 2,000 revolutions per minute, fastened above as that was, must have

vibrated greatly, and could not be run without great noise; and, the holes being open on the side of the box, the sucking in of the wind there must have added greatly to it. It is difficult to understand how one as much accustomed as the plaintiff was to machinery could go in there, when the fan was in motion,—with the noise made by it, and its vibratory motion, with these belts on either side coming almost in contact with his hands when attempting to put this pipe on, and within a few inches of his head as he stood upon the horse,—without noticing that this fan was in motion. His reply to a question put to him on his cross-examination, however, gives answer to these considerations; that is, that he was not looking to see if it was in motion. He was bound to use his faculties, and not to run heedlessly into danger. It is apparent, if he had used his eyes, ears, or sense of feeling, he would have seen the belts moving, heard the vibration and noise of the air being sucked in, and have felt, when his hand got near the hole in the box, the air being drawn in. He did neither.

In answer to these suggestions the claim is made that the plaintiff was thrown off his guard by the defendant McNally calling him to come quick and put the pipe on, as he wanted to start the blower; that, the blower not being in motion when he left it, this statement by McNally, that he wanted to start it, led the plaintiff to believe that it was then motionless; and that any ordinarily prudent man would have acted, under the circumstances, as plaintiff did, going in there under the belief that the fan was not in motion, without looking to see whether it was in motion or not. If this testimony is true,—and it was a question of fact for the jury, under proper instructions,—it accounts for the conduct of the plaintiff on that occasion; and, if an ordinarily prudent man would have done what the plaintiff did, under the

circumstances, it cannot be said, as a matter of law, that he was guilty of negligence, but would, under such circumstances, be a question of fact, for the jury to determine.

The case was submitted to the jury by the court under a full and fair charge, and the facts found against the defendants, and, there being some evidence to support the findings, we cannot disturb the verdict. Upon this part of the case the court charged the jury:

"It makes no difference what McNally may have promised the plaintiff in regard to keeping the blower still or stationary during the hour while he was working on the pipes, if, when he came into the mill and approached the machine, by the exercise of ordinary prudence and care, a man of reasonable intelligence would have detected that the machine was in motion and dangerous. If, after that, he put his hand into that blower, he did it at his own peril, and would have no right to recover in this case. * * * If he knew that the machine was in motion, and approached it for the purpose of putting this elbow on there, knowing that it was dangerous,—being apprised of the danger,—he cannot recover in this action; but if, in the running of that machine and his coming into the mill, with all the confusion and noise that may have been in the mill at that time, with the other machines in operation, if an ordinarily prudent man might not have detected the fact that it was in motion, or might not have apprehended danger, and he approached it to discharge the duty that he was called upon to do, and thrust his hand in there, and Mr. McNally knew he was about to approach that machine in that condition, and do that work, * * * it would be negligence upon the part of the defendants in this case, and he would be entitled to recover."

Again, the court said:

"The one claim here is that they induced the plaintiff to suppose that that machine was stationary, and was not to be started again until he notified them, or until he ceased to work upon the pipe; and, if you should find that fact even existing to your satisfaction, if you find

the other fact that in running this machine, that blower, when in motion, with its belts, its fans revolving,—everything in motion,—a man, in the exercise of ordinary prudence and caution, when approaching it, would be apprised of the danger, then the plaintiff would have no standing in this case, and cannot recover."

The instruction correctly states the law of the case, and put the case fairly to the jury upon the theory of the plaintiff, that when the plaintiff left the fan it was not in motion, and that he supposed it was to remain motionless until his return with the pipe, and when defendant McNally called to him to come quick and put the pipe on, as he wanted to start the blower, he went in full faith that the fan was yet standing still, and therefore did not look to see whether it was in motion or not. Under the circumstances, we think there was evidence to go to the jury upon this question, and the court was not in error in submitting the case to them.

There is no such variance between the proofs offered and the claim made by the declaration as claimed by counsel. Plaintiff did not rely solely upon the claim set up in the first count of his declaration, that the defendants promised not to start the blower until his return from fixing the pipe, but that it was the duty of defendants to have notified him of its having been started, and that when McNally called him in to put the pipe on he was misled by the statement that he wanted to start the blower. We think the declaration sufficiently broad to cover this theory of the case.

In 1 Shear. & R. Neg. (4th ed.) § 91, it is laid down as a rule of law that if the defendant, by his own act, has thrown the plaintiff off his guard, and given him reason to believe that vigilance was not needed, the lack of such vigilance on the part of the plaintiff is no bar to his claim. This rule is supported by *Railroad Co. v. Ogier*, 35 Penn. St. 60; *Ernst v. Railroad Co.*, 35 N. Y.

9; *Morrissey v. Ferry Co.*, 47 Mo. 521; *Totten v. Phipps,* 52 N. Y. 354. The rule rests in good reason and common sense; and, if plaintiff's claim is true, he had every reason to believe, from the statements and conduct of McNally, that the fan was not in motion, was thereby thrown off his guard, and did not exercise that care and caution which the law otherwise would impose upon him.

We think there is no force in the claim, made by counsel for defendants, that the court did not properly instruct the jury as to the burden of proof on the question of the contributory negligence of the plaintiff, and shall not discuss it.

Counsel for defendants assigned error upon the instruction given by the trial court upon the measure of damages. Upon this question the court instructed the jury:

"You may consider the amount of actual expense he has been to in the way of doctors' bills, nursing, and medicine. You may also consider the loss of time he has been put to, his actual loss of service, his inability to work and attend to his ordinary business; and you have a right to consider, if this injury is permanent,—if it is permanent in character,—what loss of service he may sustain in the future. You have a right to take into consideration, should you find him entitled to recover, the physical suffering and mental anguish, the bodily pain and mental suffering, he has endured from the time that he was injured until he was restored to health.

"It is hardly possible for me to point out any definite rule that is to govern you as to the measure or amount you are to award; but these elements are the ones that should be taken into consideration by you, should you conclude that he was entitled to recover anything. I say to you that, upon the subject of substantial compensation for the injury, if it consists in the loss of service or the inability to provide for himself, or to earn a subsistence, that it would not be the rule to award him a gross sum aggregating the amount which would be just what he can earn less than what he was able to earn before.

"To illustrate, if he was able to earn three dollars a day

before, and can only earn now one dollar a day, it would not be the proper rule of damages to award him two dollars a day. You should award him such a sum—such an amount—as would fairly and reasonably compensate him for the loss. But, you see, if you allowed him that aggregate sum now, it would be far too excessive. This amount is to be paid at once, and the expectancy of life, as the evidence shows in this case, is about 36 years. His earnings would be from day to day, or from month to month, and from year to year; and he would not be entitled to the aggregate sum. Perhaps a nearer rule—and I do not give it to you, gentlemen, as a controlling rule—would be such a sum of money as, put at six per cent. interest, might earn a sum equivalent to the difference in his wages. To illustrate, if he could have earned·$600 a year before the disability,—before the accident,—and that disability now extends to one-half his ability to earn money,—earn wages,—and now, with the injured hand, he is able to earn only $300, say, a sum of money that, at the ordinary rate of interest, would produce him $300 would make him fully whole for the loss. Perhaps this would be too large an amount, because you should take into consideration the contingencies of ill health, the inability to secure work, and other contingencies incident to human life. It is very difficult to give you a rule that would be of much assistance to you; but you should give him such a fair and reasonable amount, if you find him entitled to anything, as you think would fairly compensate him for the injury. In determining this question of damages, you ought to be very careful and very considerate; you ought to be very reasonable."

The court further continued to the jury that in fixing the damages they should not be influenced by the pecuniary circumstances of the parties, or give damages by reason of one man being poor or the other rich, but to deal out fair and reasonable compensation, regardless of the condition of the parties, whether poor or rich, as they were not sitting to dispense charity.

It appeared from the testimony in the case that the plaintiff had the four fingers of his left hand, and his thumb, torn and mangled, so that all the fingers and

part of his thumb were amputated. There was no question but that the injury was permanent in character.

Counsel for defendants, however, contend that the court was in error in using the illustration of money placed at interest producing a given sum. It is contended, however, that the illustration was used as mere caution to the jury to be reasonable and considerate in fixing the amount, and that the court did not use the illustration as one controlling their judgment; and especially instructed them that perhaps this would be too large an amount, because they should take into consideration the contingencies of ill health, the inability to secure work, and other contingencies incident to human life, and that they were to give him such fair and reasonable amount as would fairly compensate him for the injury.

Counsel for defendants cite the case of *Chicago & Northwestern Railway Co. v. Bayfield*, 37 Mich. 215, as sustaining their position. In that case the illustration was used by Chief Justice COOLEY in delivering the opinion of the Court. The only question then under consideration was the instruction given by the trial judge, that the jury, in estimating damages, should take into consideration whether the family of the deceased were in poor and needy circumstances, and looked to the boy, when alive, for at least partial support; and upon this Chief Justice COOLEY remarked, in speaking of the amount of damages awarded ($3,400), that—

"It is difficult to understand any estimate which would place the loss of the family at such a sum. The annual interest on it, at the customary legal rate for money borrowed, would have been more than three-fourths the whole annual earnings, even supposing Williams to have had steady employment, and to have lost nothing from sickness or other contingencies, and, at the lowest statute rate, it would have been more than half. It seems incred-

ible that the family could have had reasonable expectation of receiving an annual sum to either amount from such a source; but, if they had, they could, at most, have realized it only for his life-time, while this award of the sum in gross would enable the family to realize the income, not for his life merely, but in perpetuity."

Here the plaintiff was suing for injuries which were permanent, and to continue for a life-time. He was a man in apparent good health, and sound in limb, before the accident. He was a boiler-maker by trade, and capable, as shown by the evidence in the case, of earning large wages.

If, as claimed by defendants' counsel, the jury were influenced by this illustration, and fixed an amount which, placed at interest at 6 per cent., would amount to $300, the deficiency of plaintiff's earning capacity as used by the court in the illustration, yet the other elements of damages, which were proper to be considered, and which the jury must have taken into consideration, are not necessarily included therein. The amount paid for physicians, medical attendance, nurses, and medicine, the physical pain and suffering and mental anguish endured, were all elements to be considered in fixing the amount of the recovery, as well as mere loss of service and his inability to earn wages.

We think, however, that the court was in error in the use of this illustration. If the jury might give an amount which, placed at interest at 6 per cent., would produce the amount representing the loss of his earning capacity, it would be in perpetuity; and this he is not entitled to have. We see no error in the other portions of the charge, as to the measure of damages.

Error is also assigned upon the ruling of the court in permitting plaintiff to testify that soon after the accident he stated his case to Shields & McNamara, attorneys at Alpena, substantially as testified to by him on the wit-

ness stand. Defendants' counsel, at the time, made no objection to the inquiry, except when the further question was put, as to whether they took down his statement. Defendants' counsel objected to the answer to this question, unless the witness stated which one. Thereupon the court permitted the witness to testify that he made a statement to counsel. This was error. Counsel for the plaintiff contend that this was proper, for the reason that one Luther had been permitted to testify that plaintiff, about that time, told him he did not know how he did it, or how he came to be injured. This testimony would in no sense tend to contradict Luther, and was incompetent.

The sixth assignment of error relates to the ruling of the court in allowing the plaintiff to show that, two or three days after the injury, Mr. McNally, one of the defendants, told John Kinney to tell Dave (plaintiff) that the company would see him through all right, and not to worry, and that that would do him more good than all the medicines, or all the doctors, could do for him. The court was in error in permitting this testimony. It was in no sense a confession or admission of liability on the part of Mr. McNally or the company, and yet the admission of such testimony may have been very prejudicial to the defendants.

Some claim is also made that the court was in error in refusing to give defendants' requests to charge. We think some of the requests state the law correctly, but that they were fully covered by the charge as given. Those referring to the starting of the blower by some of the employés, instead of the defendants, we think, have no force here, and need not be noticed. The judgment of the court below must be reversed, with costs, and a new trial ordered.

The other Justices concurred.